WESLEY W. WEST, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 109850, 109851, 109853, 109855. Promulgated March 10, 1944.

[1] Proceedings of the following petitioners are consolidated herewith: J. Marion West; Estate of J. M. West, Deceased, James M. West, Jr., Wesley W. West, J. Arthur Platt, Philip M. Stevenson and T. H. Monroe, Executors; and Jessie Gertrude West.

*J. Arthur Platt, Esq., James H. Yeatman, Esq., H. I. Wilhelm, C. P. A.*, and *J. A. Phillips, C. P. A.*, for the petitioners.

*James L. Backstrom, Esq., Frank B. Schlosser, Esq.*, and *L. R. Van Burgh, Esq.*, for the respondent.

434

## OPINION.

ARNOLD, *Judge*: Petitioners contend that the deed executed by them was a deed of bargain and sale which passed to Humble title not only to the surface of the land, but to the minerals in and under it as well. They further contend that, since the land and minerals were conveyed by an absolute deed of bargain and sale, the provisions of the supplemental contract, herein called the agreement, could not and did not have the effect of converting the conveyance into a lease. And, finally, petitioners contend that the transaction with respect to the Hutcheson and Sowden leases was a sale of their interests in the leases because they retained no overriding royalty interest therein.

Respondent contends that, with respect to the minerals underlying the land, the deed, assignment, and agreement of December 28, 1938, were in substance and practical effect a leasing arrangement. He urges that the deed and the agreement must be read together as one instrument and that when so read together the petitioners sold the surface of the land and the improvements thereon, but made no sale of the minerals, for to so hold would give effect only to the provisions of the deed and would ignore the provisions of the agreement executed con-

temporaneously therewith and incorporated as a part of the deed by reference. Respondent points out that petitioners retained an economic interest in the minerals entitling them to allowances for depletion and that such an allowance is entirely inconsistent with the theory of a bargain and sale agreement, because the sale would deprive the vendor of a depletable interest. Respondent further points out that the multiplicity of requirements and restrictions cast upon Humble is foreign to fee ownership, but is consistent with a leasing arrangement. And, finally, respondent asserts that the combination of the sale of the surface with the leasing of the minerals need not be confusing, for the problem is no different than it would be if petitioners had conveyed the surface to a third party and then entered into this same arrangement with Humble with respect to the minerals.

In their reply petitioners agree that the deed and the agreement must be considered together. and state that they "have not intended to take any other position." They urge, however, that the deed, standing alone, has the effect of conveying to Humble an indefeasible legal title to the minerals, as well as the surface, subject only to the fraction of the minerals which was excepted from the grant and not sold. They insist that, unless some condition is found in the agreement which will have the effect of reinvesting the minerals in petitioners upon a breach of the condition, the transaction must stand as a sale of the lands and the minerals therein. Petitioners contend that respondent has wholly failed to point out any such condition, but merely argues that while the surface was conveyed the covenants imposed by the agreement restrict or qualify the estate granted by the deed to such an extent that as to the minerals the transaction becomes a lease. Petitioners contend that there are no conditions in the deed and agreement, but only covenants, any breach of which entitles them to compensation in damages but gives no right of forfeiture such as appears in the ordinary lease.

In his reply respondent agrees with petitioners that minerals may be severed from the surface and transferred as real estate. He also agrees that petitioners could sell a part of the minerals in place or a part or all of the royalty interest. In either event he agrees that upon the sale the capital gain provisions would apply, but he submits that the arrangement here provides in detail for the exploitation of the minerals, which is repugnant to a conveyance in fee but universally present in mineral leases.

By their stipulations and by the concessions in their briefs the parties have eliminated all controversial questions encompassed in this issue except the determination of the character of the contract executed by the parties; that is, whether the transaction was a leasing arrangement or a sale in so far as the mineral rights are concerned.

In determining the character of the contract it must be remembered that we are dealing with both an assignment of oil leases and a deed which admittedly conveyed the fee to the surface of all but three of the tracts of land described therein. That the contract may be divisible, that is, part sale and part lease, must be recognized in view of the opinion of the Circuit Court of Appeals for the Fifth Circuit in *Cullen* v. *Commisisoner*, 118 Fed (2d) 651, and *West Production Co.* v. *Commissioner*, 121 Fed. (2d) 9.

Considering first the assignment of the Hutcheson and Sowden leases, our findings show that petitioners excepted and retained in section II of the agreement overriding royalties on oil, gas, and other minerals on the production from such leases, said overriding royalties to be reduced by the amount of royalties payable under the terms of such respective leases. We have found as a fact that the Hutchesons leased to the Wests that one-half interest in the oil and minerals which they had excepted in a previous conveyance to the Wests, for a reserved royalty of one-fourth of all oil and gas produced and saved from the entire tract. The Wests reserved and excepted three-eighths of all oil and gas produced and saved from the entire tract in their conveyance to Humble, so that their override amounted to a one-eighth of all oil and gas produced from the lease. Simultaneously with the execution of the lease the Hutchesons assigned one-half of their reserved royalty, i. e., one-eighth, to the Wests until the proceeds therefrom amounted to $55,000, in order to reimburse the Wests for an advanced royalty payment. Actually, therefore, the Wests were to initially receive two-eighths of the three-eighths royalty they had reserved in their assignment to Humble, but only until the one-eighth assigned amounted to $55,000. Thereafter, the Wests would receive only their overriding royalty in the amount of one-eighth of production. Thus production from the Hutcheson lease was owned five-eighths by Humble, one-eighth by the Wests, and two-eighths by the Hutchesons.

With respect to the Sowden lease, our findings show that the lessor reserved a one-eighth royalty and in addition $150 per acre out of one-fourth of seven-eighths of the first oil, gas, and other minerals produced and saved from the land. Under the lease, therefore, the lessor was entitled to four thirty-seconds of production from the leased premises plus seven thirty-seconds of the production until it amounted to $60,000. By the assignment and agreement the Wests reserved and excepted twelve thirty-seconds of the production and bound themselves to pay the royalties reserved by the lessor. Clearly, the Wests had an overriding royalty at all times of one thirty-second, and after the $60,000 oil payment was satisfied their overriding royalty amounted to eight thirty-seconds or two-eighths, which with Humble's

five-eighths and the lessor's one-eighth accounts for the production from the Sowden lease.

Under these facts the authorities require a holding that petitioners' transaction with Humble with respect to the Hutcheson and Sowden leases was a leasing arrangement and not a sale. *Cullen* v. *Commissioner, supra; West Production Co.* v. *Commissioner, supra; McLean* v. *Commissioner,* 120 Fed. (2d) 942; *Commissioner* v. *Fleming.* 82 Fed. (2d) 324; *Palmer* v. *Bender,* 287 U. S. 551; and *Burnet* v. *Harmel,* 287 U. S. 103. Since, for Federal tax purposes, this portion of the December 28, 1938, transaction was a sublease, the stipulated amounts of the cash consideration allocable to the Hutcheson and Sowden leases constituted bonuses subject to depletion and not gains derived from a sale of the leases.

With respect to that portion of the December 28, 1938, transaction, which relates to the surface of the 22,955.60 acres, the parties are agreed that a sale was made and that $1,721,670 of the cash consideration paid by Humble should be allocated to the surface of the land. The difference between the stipulated cost of the surface and $1,721,670 represents capital gain, and since the land was held by the Wests for more than two years only 50 percent thereof should be included in net income under section 117, Revenue Act of 1938.

Our findings show the cash received by each of the petitioners and by the trustees for the West Foundation for their undivided interests in the properties conveyed and the amount received by each representing the cash purchase price paid by Humble for their undivided portions of the improvements located on the lands and leases. The total purchase price shown by the agreement as being paid for all of said improvements is $123,083.73, but neither the agreement nor the record shows any allocation of this total between the land and leases. Presumably the major portion of the improvements was located on the lands conveyed, as tract 29, described in the deed, conveyed to Humble the title the Wests acquired from the Hutchesons by their deed dated March 24, 1927, in which the grantors "excepted and reserved in fee simple title from this conveyance one-half of all oil and minerals in or under the said tract of land." By the lease of April 5, 1938, the Hutchesons leased to the Wests their retained one-half interest, so that by virtue of the deed and the assignment Humble acquired not only title to the surface and the improvements thereon, but also the right to exploit and develop the Hutchesons' retained interest in all oil and minerals under the tract. Thus the only improvements that may not have been sold are the improvements, if any, on the 20-acre tract covered by the Sowden lease. We see no reason to labor the point as to the 20 acres, since respondent conceded in his

original brief that "there was a sale of the surface land and improvements."

The next and principal question is whether the parties effected a leasing arrangement with respect to the mineral content of the 22,955.60 acres and the 70.67 acres, or a sale thereof. The answer is to be found by ascertaining the intent of the parties and by determining whether the instruments executed carried out their intent. In construing the contract we may look not only to the language employed, but to the subject matter and the surrounding circumstances, and we may avail ourselves of the same light which the parties possessed at the time the contract was made. *United States* v. *Peck*, 102 U. S. 64; *Merriam* v. *United States*, 107 U. S. 437; *United States* v. *Gibbons*, 109 U. S. 200; *Sand Filtration Corporation* v. *Cowardin*, 213 U. S. 360; *Scott* v. *United States*, 12 Wall. 443.

The stipulated facts show that petitioners and the trustees for the West Foundation owned in fee certain properties. The uncontradicted testimony is, and we have found as a fact, that prior to December 28, 1938, J. M. West told the president of Humble that he wanted to sell these properties and the leases here in question. Humble was interested in the right to operate and develop the lands for the production of oil and gas. That was its business. It negotiated with West for the acquisition of the properties for that purpose. This is clearly shown by the testimony of Barrow, who handled the matter for Humble.

Mindful, as we are, of the fact that the surface of the land can be severed from the mineral content thereof, and that either can be disposed of separately, a fair construction of Barrow's testimony would be that West would not lease the land and mineral contents without selling the surface, but he would lease the minerals if Humble would buy the surface of the land and the improvements thereon. Barrow testified that West would "sell it [a lease for oil and gas] with the property in fee." This interpretation is indicated by the inescapable fact that the impelling motive in the negotiations was the development and operation of potentially productive oil and gas properties and not the acquisition of the surface of the land or the improvements thereon, including the homestead tract. Humble's complete lack of interest in the surface of the land is demonstrated by its leasing of the land back to West for grazing and agricultural purposes.

With the subject matter and the surrounding cirmustances as background, we shall look next to the language employed in the deed and agreement in order that we may avail ourselves of the same light which the parties possessed at the time the contract was made. The deed does not purport to convey *all* of the interest of the Wests in the mineral contents. The granting, the habendum, and the general warranty clauses, each and all, contain words of limitation excepting from

the conveyance and retaining to the grantors those certain royalties specifically described in the agreement. The situation here is distinguishable from *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372, where the Supreme Court pointed out that the contract provided for an absolute sale of *all* the properties, including *all* the oil and gas in place, without the retention of any interest or investment therein by the taxpayer.

The only language in the deed which specifically refers to the mineral rights acquired by Humble is in paragraph G thereof. It is there stated that among other properties conveyed to Humble is "Also all oil, gas and other minerals *produced from the land* affected by this deed and produced subsequent to seven o'clock, A. M., Dec. 28, 1938." (Italics supplied.)

Section XVIII of the agreement uses the following language: "Humble shall be entitled to all oil, gas and other mineral *produced from the property* affected by said deed and assignment, subsequent to seven o'clock A. M. Dec. 28, 1938." (Italics supplied.)

On the same day the deed and agreement were executed a division order was executed such as is used in ordinary leasing transactions, in which the parties certified that Humble was the owner of a five-eighths interest and the Wests a three-eighths interest in all *oil produced from the tract* described therein. The division order stated that "the oil run hereunder shall on the terms herein contained become the property of the Humble Oil & Refining Company immediately upon being received into the possession of said Company * * *." It was agreed that similar division orders were executed by the parties covering other productive portions of the land involved.

Obviously the Wests were familiar with the terms used in conveying oil, gas, and mineral rights. In the deeds of the mineral rights to J. M. West in tracts 108, 109, and 110, the conveyance was of "all the oil, gas and other minerals on, in and under and that may be produced from" the land. The Hutcheson deed to J. M. West was for "one-half of all oil and minerals in or under" tract 29. Here the conveyance to Humble was of "all oil, gas and other minerals produced from the land affected by this deed" subject to the exceptions therein stated. The common meaning of the verb "produce" is "to bring into existence from previous materials, especially as a natural product; bring forth; give birth to; generate; supply; yield; * * *"; "produced" means "drawn out." Funk & Wagnalls New Standard Dictionary. The language used in the deed, agreement, and division orders justifies the conclusion that that part of the oil not produced from the premises did not pass to Humble, but remained in the Wests. If the parties had intended a sale of five-eighths of the oil and gas

in place to Humble, we think appropriate language to that effect would have been used.

Unquestionably the royalty interest excepted and retained by the Wests was a fractional part of the oil, gas, and other minerals and is comparable to the interest retained by the Hutchesons in their lease to the Wests on April 5, 1938. In other words, the property right excepted and retained by the Wests from their conveyance to Humble was essentially the same property right that an owner retains to himself when he leases his land to another and reserves a fractional part of the production from the property. In a proven area an advanced royalty or bonus is usually paid for executing a lease. It was entirely consistent with normal business usage and custom in the oil industry for the Wests and Humble to enter into a leasing arrangement with respect to the mineral rights in these properties, the Wests retaining a royalty interest and receiving an advanced royalty or bonus.

From a practical standpoint the provisions of the agreement weigh heavily in favor of a leasing arrangement. One can not examine the terms and provisions of the agreement without realizing that its main purpose was to protect and secure to the grantors the three-eighths royalty interest which they specifically excepted and retained from the conveyance. Without development and operation of the properties they would receive no return on their interest and it would be of no value to them. Hence, in order that they might be assured of a return the grantors bound their grantee, an operating company, to operate with reasonable diligence not less than four drilling rigs, two each in the Friendswood and Clear Lake Oil Fields, until the fields were reasonably developed; to develop reasonably any oil sand or sands under land not within the Friendswood or Clear Lake Oil Fields; to drill offset wells; to drill under stated circumstances certain deep test wells; and to perform the obligations contained in the leases, so long as Humble retained the leases. The parties covenanted and agreed that petitioners would sell and Humble would buy all royalty oil; that division orders would be executed and delivered to Humble covering the sale of such royalty oil; that the provision for free fuel for operating and developing did not extend to certain other leases owned by Humble; that an oil well meant a well capable of producing oil in paying quantities; that the royalty and overriding royalty provisions should be applied in a certain manner where a particular sand in a particular field varied with respect to the 7,500 foot depth; that there were no implied obligations on account of the royalties and overriding royalties; that Humble was excused from performing any obligation where performance was prevented for any cause or reason beyond its control; that petitioners had the right of ingress and egress over the lands conveyed at all reasonable times to take, receive, and

transport the royalty oil, gas, and other minerals; that petitioners had the right to be represented when gauges were made and the right to be furnished with copies of the logs of wells drilled or drilling; that Humble should have the right of ingress to and egress from the 70.67 acres for the purpose of investigating, exploring, prospecting, drilling, and mining thereon and other rights incident thereto or incident to production; that the undivided interests of the grantors in the lands and leases and the cash consideration paid by Humble to each of the grantors were in the amounts set forth in our findings of fact; that after 7 a. m., December 28, 1938, Humble was entitled to all oil, gas, and other mineral produced, subject to the royalties and overriding royalties excepted and retained; and that in case of disagreement as to any matter relating to the development of the land and leases which parties could not amicably settle, the matter in disagreement should be submitted to a board of three disinterested oil operators as arbitrators, whose decision should be final and binding on the contracting parties.

Most, and in some instances all, of the above requirements and obligations are imposed upon lessees in the usual oil and gas lease. Each of these requirements, covenants, and obligations is imposed for the protection of the lessor and is designed to secure to him the interest in production which he retains upon executing the ordinary lease. One or more thereof might be absent therefrom without detracting one whit from the nature of the transaction. The presence here of so many of the provisions normally occurring in the usual oil and gas lease supports respondent's contention that the December 28. 1938, transaction was a leasing arrangement rather than a sale with respect to the mineral content. The execution by the parties of division orders covering oil and gas produced from the property such as are commonly used under leasing arrangements likewise supports this construction.

It is recognized that there are factors here that favor petitioners' contention. The question is which group of factors predominate. We shall, therefore. next examine the factors supporting petitioners' viewpoint. The arrangement involved the payment of a substantial cash consideration by the grantee and the absolute transfer of some properties to it. No provision was made for a reversionary interest in the grantors. No provision was made in either instrument that the grantee's failure to perform its contractual obligations, covenants, and duties would work a forfeiture of the properties and all rights acquired under the contract. The words "lease, let, demise, lessor, and lessee," commonly and ordinarily employed in a lease, were omitted from the deed and agreement.

The Supreme Court has stated that in the field of taxation we are concerned with the substance and realities, and formal written documents are not rigidly binding, *Helvering* v. *Lazarus & Co.*, 308 U. S. 252; that the formal attributes of instruments or the descriptive terminology which may be applied to them in the local law are both irrelevant, *Palmer* v. *Bender, supra*; that the "reach of the income tax law is not to be delimited by technical refinements or mere formalism," *United States* v. *Joliet & Chicago Railroad Co.*, 315 U. S. 44; and that "Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes should not obscure the basic issue," *Helvering* v. *Clifford*, 309 U. S. 331. See also *Anderson* v. *Helvering*, 310 U. S. 404.

Petitioners stress the substantial cash payment which they received, the apt words of conveyance used in the deed, and the decisions of the Texas courts in *Danciger Oil & Refining Co. of Texas* v. *Powell*, 154 S. W. (2d) 632 (1941); *Duhig* v. *Peavy-Moore Lumber Co.*, 144 S. W. (2d) 879 (1940); *Loomis* v. *Gulf Oil Corporation*, 123 S. W. (2d) 501 (1938); and *Hynson* v. *Gulf Production Co.*, 232 S. W. 873 (1921). Petitioners assert that in view of the language employed in the instruments and the decided cases there does not appear to be the slightest doubt but that the Texas courts would hold the deed was an absolute conveyance of the land and the minerals to Humble. This argument loses much of its force in the light of the Supreme Court's decision in *Burnet* v. *Harmel, supra*. There the taxpayer asked the Supreme Court to apply the capital gain provisions of the Revenue Act of 1924 to income from oil and gas leases because in Texas such leases were regarded as a present sale of oil and gas in place. In rejecting the argument the Supreme Court pointed out (1) that taxation of the receipts of a lessor as income does not ordinarily produce the kind of hardship aimed at by the capital gains provisions; (2) that the determination of gain from the sale or exchange of capital assets is not controlled by state law; and (3) that for the purpose of applying the capital gain section the revenue act has its own criteria, irrespective of any particular characterization in the local law. See also *Hogan* v. *Commissioner* (C. C. A., 5th Cir.), 141 Fed. (2d) 92.

Nor is the use of apt words of conveyance in the deed controlling, as contended by petitioners. It appears from the opinion of the Board in *H. R. Cullen*, 41 B. T. A. 1054, and in *West Production Co.*, 41 B. T. A. 1043, that the instrument of conveyance granted, bargained, sold, and conveyed all interest in the leases involved, subject to the overriding royalty in some but not all of the leases. On appeal the Fifth Circuit, notwithstanding these general words of conveyance, held that the transaction was a sublease and not a sale as to all leases in which an

overriding royalty was retained, and a sale as to those leases where no royalty interest was retained. *Cullen* v. *Commissioner*, *supra.* and *West Production Co.* v. *Commissioner*, *supra.* See also *Hogan* v. *Commissioner*, *supra.* Here, as there, a royalty interest at least was excepted and retained in each and every tract, and the parties specifically provided it should not pass to Humble.

Petitioners also cite the statement from *Helvering* v. *Stuart*, 317 U. S. 154, that "Grantees under deeds, wills and trusts, alike, take according to the rule of the state law," and urge that under this doctrine the Supreme Court would hold that petitioners sold the land and minerals to Humble except for the three-eighths royalty interest retained. We are unable to perceive the applicability of the *Stuart* case. We are here concerned not with the legal interests and rights created by state law, but with how the interests and rights, so created, shall be taxed. Shortly after the statement in the opinion upon which petitioners rely, the Court said: "Once rights are obtained by local law, whatever they may be called, these rights are subject to the federal definition of taxability." It is precisely this Federal definition of taxability that we must decide; that is, whether the major portion of the cash payment by Humble was capital gain derived from a sale, or ordinary income realized from a leasing arrangement.

Our examination of the last cited Texas cases convinces us that none of them involved a situation comparable to the present facts. In analyzing those decisions we noted with interest the statement of the Supreme Court of Texas in the *Danciger* case that "the most essential difference [between a lease and a conveyance of minerals] is the fact that the predominating purpose of a lease is to secure the exploitation and development of the property for the purpose set out in the lease." (P. 635.) In our opinion the predominating purpose of the present contract was to secure the exploitation and development of the properties for oil, gas, and other minerals, a fact clearly evidenced by the care that petitioners exercised in drafting the duties, obligations, and covenants imposed on and accepted by Humble.

Finally, the petitioners argue that, since in the case of a lease there must always be a reversionary interest remaining in the landlord, or a possibility of reverter to him, and since there is no possibility of the property ever reverting to petitioners by forfeiture or otherwise, this circumstance alone precludes the transaction from being treated as a lease or the cash consideration as a lease bonus. This argument presupposes title to all the oil in place passed to Humble and rests strictly upon technical considerations and niceties of the law of conveyances, whereas the economic consequences of the transaction are of more importance in administering the income tax laws. In *Palmer* v. *Bender*, *supra*, the positions of the taxpayer and the Commissioner

were the reverse of that obtaining here. There, the Commissioner conceded that the taxpayer was entitled to depletion "if any reversionary interest, according to the common law, however small, has been retained in the leased land * * *." Nevertheless, the Supreme Court gauged the right to depletion deduction by the economic consequences of the transaction, and pointed out that "The formal attributes of those instruments or the descriptive terminology which may be applied to them in the local law are both irrelevant." We can perceive no good reason, in view of this language by the Supreme Court and in view of its decision that it is immaterial whether the instrument is a sale or a sublease, why the presence or absence of formal attributes of leasing instruments should be decisive of the present issue.

We do not think the absence of a forfeiture clause necessarily converts what would otherwise be a leasing arrangement into a sale. The Wests were competent to contract, and if in so doing they relied for their protection upon their right to sue for and recover damages for breach of their contract by Humble, the absence of a forfeiture provision would not have the effect of making the transaction a sale. Furthermore, a forfeiture would be inconsistent with the purposes sought by them; that is, the development and operation of the mineral rights by Humble for their benefit. Petitioners relied upon their contractual right to recover damages for failure of Humble to perform its drilling and other obligations. They reinforced this right of action with an agreement to arbitrate any dispute relating to the development of the land and leases. The absence of lease nomenclature is merely a factor to be weighed with other factors in arriving at the intent of the parties.

Having thus considered the subject matter of the contract, the circumstances leading up to the execution of the instruments evidencing the contract, the language employed in the instruments, the various provisions of the instruments, and the arguments of the parties, we are of the opinion that, for Federal tax purposes, petitioners intended to and did effect a leasing arrangement with respect to the minerals. We hold, therefore, that an allocable portion of the cash payment received by petitioners represented a bonus or advanced royalties and not capital gain derived from the sale of the mineral contents.

What we have said with respect to the 22,955.60 acres applies with equal force to the 200-acre homestead tract. The cost of the homestead is itemized in our findings and aggregates $599,693.15. The stipulated facts and the agreement show that Humble paid $599,943.15 for the homestead and the improvements thereon, of which only $5,974 applied to the land and minerals. Since we have held that the transaction of December 28, 1938, was a leasing arrangement with respect to the minerals underlying the tracts conveyed, in recomputing the deficiencies effect must be given to the parties' stipulation that $4,974

of the consideration for the homestead tract should be allocated to the surface, and the difference between this amount and the cost is subject to tax as gain on the sale of property held for more than two years. Effect should likewise be given in recomputing the deficiencies to the other adjustments stipulated by the parties.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: I dissent from that part of the opinion which holds that there was a lease of mineral rights including oil and gas underlying the surface lands which were sold. Both parties agree that the transaction of December 28, 1938, effected a sale of the surface lands and one of the instruments executed on that date was a warranty deed conveying those surface lands. The deed, by its terms, purported to convey everything which the sellers had except a retained fractional interest in the minerals. Since the deed was sufficient to convey the surface lands, then it must have been sufficient to convey a fractional interest in the minerals. The supplemental agreement did not change the conveyance of the minerals into a lease while leaving the conveyance of the surface lands stand. The supplemental agreement had a purpose which was not inconsistent with a conveyance of the minerals. I think that the petitioners sold a fractional interest in the minerals to Humble and a capital gain resulted.

---

DISNEY, *J.*, dissenting: The question is whether there was an outright conveyance of land in fee, with retention of a royalty interest and a special and limited arrangement for the production of oil or gas from the premises, or whether such production arrangement was such as to justify a holding that it was equivalent to an oil and gas lease; in other words, whether, despite the language of the instrument conveying all oil, gas, and other minerals produced from the land (except a royalty interest retained specifically), the petitioner nevertheless retained all of the oil and gas mineral rights so as to be entitled to a royalty upon the production thereof. I am unable to persuade myself that the conveyance and the contract amounts to such reservation of mineral rights in the land. There is no lease in form. Can it be found in substance?

In the first place, the conveyance is one of the title to land:

Also all oil, gas and other minerals produced from the land affected by this deed and produced subsequent to seven o'clock, A. M., December 28, 1938; subject, however, to the royalties hereinabove and hereinafter more specifically referred to * * *

* * * * * * *

The Grantors jointly except from this conveyance and retain unto themselves, their heirs, successors and assigns, those certain royalties on oil, gas and other

minerals which may be produced and saved from the lands hereby conveyed * * * [described in the contract], and such royalties so excepted and retained are not herein conveyed * * *

The majority opinion stresses the fact that reference is made to the minerals "produced subsequent to seven o'clock, A. M., December 28, 1938," as indicative that the mineral rights in general were not conveyed. There were already producing wells on the property and in my opinion the phrase used was merely the usual one to indicate the effective date of the conveyance and that oil produced prior thereto would not pass thereunder. If this be true, we find a general conveyance of all oil, gas, and mineral rights, subject only to a specific retention of royalties upon production. Such language in a deed of general warranty, admittedly conveying all other rights in the land, may not, with logic, be read, without great difficulty, as a retention of all oil, gas, and mineral rights merely because reference is also made to a supplemental contract which in connection with a royalty interest reserved does set forth some, but by no means all, of the usual provisions of an oil and gas lease. The reference to the supplemental contract is made "for more specific description of the royalties excepted herefrom and retained by the Grantors herein and of the rights, obligations, duties and agreements of the parties hereto with respect to such royalties." Had the intent been to retain the oil, gas, and mineral rights and to grant a lease therefor, entailing royalty, it seems apparent that it could have been accomplished simply and in the usual manner by a mere retention thereof and the execution of such lease.

In *Danciger Oil & Refining Co. of Texas* v. *Powell*, 154 S. W. (2d) 632, the Supreme Court of Texas considered a situation very similar to that here involved and in one respect altogether parallel, as hereinafter noted; and the court concluded that there was conveyance of minerals and not a mere lease—and this in spite of the fact that the conveyance was not, as here, of all oil, gas, and other minerals (except a royalty), but merely of oil, gas. and casinghead gas; and despite also the fact that the conveyance was not made as an integral part of the conveyance of the fee. The fee had already been transferred by the grantor. As herein, there was a reservation from the conveyance, with an agreement therein set forth that if oil or gas be produced one-eighth thereof should belong to the grantors. There was no provision requiring development of the property for oil or gas purposes except specific provision for the drilling of offset wells, and as in the instant case there was no provision for forfeiture for failure to develop. The action filed was for damages for failure to develop after the discovery of oil. The majority opinion herein states that there was no provision for forfeiture and that the "Petitioners relied upon their contractual right to recover damages for failure of Humble to perform its drilling and other obligations," referring also to an agreement to arbitrate any

dispute. The court in the cited case held that under such conveyance of the minerals there was no implied covenant for development. It noted that a lease is usually for a limited time, with provision for termination thereafter upon cessation of production; whereas the conveyance made was unlimited as to time; also that there was (as herein) substantial consideration, $100.000; and that the only circumstance in favor of an implied contract was the retention of the overriding one-eighth interest in the minerals. The situation in the instant case can be distinguished from that in the *Danciger* case only by the fact that there was some considerable agreement for the development of the property, in substance, that the grantee would maintain two drilling rigs in each of two known oil fields covered by the lands conveyed until that part of the land had been reasonably developed to the extent of one well to each 20 acres, unless drilling of greater density was necessary; also that it would drill certain deep tests after five years; also that it would drill offset wells. However, offsets were to be drilled only as promptly as practicable with the drilling rigs the grantee obligated itself to operate, that is, two rigs to each field. Manifestly, considering the fact that more than 22,000 acres of land are here involved, such provision altogether fails to meet the usual implied covenant for development of the property—even during the life of the oil fields known at the time of the conveyance.

What will be the situation after the exhaustion of such known fields? If we were to assume that the contract provides such reasonable provision for the development of the known fields as to meet the admittedly prime object of the lease, to wit, to secure the exploitation and development of the property, we find in the situation after the complete development of such pools, a complete parallel to the situation described in the *Danciger* case, that is that there is no implied covenant at all to develop. It will be noted that particular provision is made that Humble shall in no event be required to drill below 10,000 feet; and further that "At any time hereafter, should oil, gas, or other mineral in paying quantities be discovered in any sand under any portion of the land affected by said deed" (and not included in the two known fields), Humble obligated itself to reasonably develop such sands to the extent of one well to each 20 acres unless greater density of drilling is required "by reason of the fact that such sand under lands other than the lands affected by this contract and by said deed * * * have been drilled to a greater density * * *." In other words, one can not find any requirement that the grantee itself shall explore the land conveyed except to continue the development of the known fields and to drill certain deep tests to not more than 10,000 feet. The grantee can only be forced to develop the land if offsets on other lands require drilling and then with only two rigs within each of the two known fields. There seems not even that much

requirement as to any land outside of the two known fields. Such provisions are believed to be altogether insufficient to demonstrate an implied covenant to carry out "The predominant purpose of a lease * * * to secure the exploitation and development of the property * * *." Bearing in mind that this contract is in perpetuity, we seem required to conclude that the grantee was not under any obligation throughout the long future to develop the real estate conveyed, consistent with the ordinary obligations of an oil and gas lease. After exhausting the known fields and drilling the certain test wells not deeper than 10,000 feet it could, without the payment of the delay rentals almost universally incidental to oil and gas leases, hold the property forever, except to use perhaps not more than four drilling rigs to drill offsets, despite the fact that drilling operations are well known to be carried ever deeper and beyond 10,000 feet. At no time after the complete development of the present fields, and the drilling of the certain deep tests to 10,000 feet, can there be found any contractual arrangement involving any duty on the grantee to prospect or develop the property except only a very limited duty to drill offsets if others find oil or gas on adjoining tracts. Such a situation is believed to be contrary to all common ideas of oil and gas leases. Existing perpetually, it seems to be consistent only with a complete conveyance in fee, which it can hardly be gainsaid is the general character of the deed involved here.

Being of the opinion that the essential elements of an oil and gas lease, to wit, the ownership of oil, gas, and mineral rights and the contractual development thereof for a share, is not shown in the facts here, but that there is a general conveyance in fee, subject only to the specific reservation of a share, with provisions for development limited both in character and in time, I respectfully dissent.