Arthur N. Trembley v. Commissioner. Adele Trembley Wilson v. Commissioner. Corinne T. Barnes v. Commissioner.
Trembley v. Commissioner
Docket Nos. 16684, 16983, 16984.
United States Tax Court
1948 Tax Ct. Memo LEXIS 6; 7 T.C.M. (CCH) 972; T.C.M. (RIA) 48270; December 29, 1948
*6 Arthur N. Trembley, Adele Trembley Wilson and Corinne T. Barnes, pro se. George D. Gibson, Esq., for the respondent. JOHNSON Memorandum Opinion JOHNSON, Judge: The Commissioner determined deficiencies in petitioners' income tax for 1944 as follows: Arthur N. Trembley, $464.05; Adele Trembley Wilson, $263.96; Corinne T. Barnes, $277.46. The sole question presented is whether conveyances by petitioner were sales, and profits therefrom taxable as long term capital gains, as they claim, or whether, as respondent determined, that same were mineral leases and amounts received for their execution were cash bonuses or advance royalties and taxable as ordinary income. Petitioner Arthur N. Trembley concedes as correct the $26.16 item determined against him by the Commissioner. These proceedings were consolidated and submitted under Rule 30, upon a stipulation and exhibits which we adopt as our findings of fact. [The Facts] The petitioners, who are brother and sisters, reside in Webster Groves, Missouri, and each filed a Federal income tax return for 1944 with the collector of internal revenue for the first district of Missouri. In 1944, and for many years prior *7 thereto, the petitioners, through inheritance, were the owners in fee simple of certain tracts of land in Jefferson County, Texas, upon which up to July 12, 1948 (date of Stipulation of Facts) no sulphur mines have ever been located or from which land no sulphur has ever been produced, and neither has sulphur been mined or produced from any adjoining tracts of land. None of the petitioners was in the business of buying and selling mineral rights. With reference to these lands, the petitioners on December 6, 1944, executed two written instruments, being Exhibits 1-A and 2-B, both of which are identical in every respect except for the land described therein, and are as follows: "THE STATE OF TEXAS
"COUNTY OF JEFFERSON
"KNOW ALL MEN BY THESE PRESENTS: "That we, Arthur N. Trembley, Adele Trembley Wilson, and husband, E. F. Wilson, and Corinne Trembley Barnes, a feme sole, of the County of St. Louis, State of Missouri, hereinafter referred to as Grantors, for and in consideration of the sum of Ten ($10.00) Dollars, and other good and valuable consideration to us in hand paid by E. G. Bartlett, hereinafter referred to as Grantee, the receipt of which is hereby acknowledged and *8 confessed, "Have, subject to the reservations and provisions hereinafter set out, GRANTED, SOLD and CONVEYED, and by these presents do, subject only to the reservations and provisions hereinafter set out, GRANT, SELL and CONVEY unto the said E. G. Bartlett, all sulphur, sulphur royalty, rights, titles, interests and estates vested and reversionary, in, to, on and under those certain tracts of land out of the John A. Veatch Survey in Jefferson County, Texas, described as follows: [Here follows description of land]. "NOTE: The land described in 1-A and 2-B covers a number of small parcels of city property, evidently contiguous. The description refers to lot and block numbers and the acreage is not acertainable therefrom. In the margin of 1-A and 2-B, opposite the description of each parcel, are evidently acreage computations, and if these are correct, the total acreage in both instruments would be less than six acres. "It is the intention of Grantors herein to convey, and there is hereby expressly conveyed, all of Grantors' rights, titles, interests and estates vested and reversionary, in and to the sulphur in, on or under the above described tracts of land, and all streets *9 and alleys adjacent thereto, regardless of whether said rights, titles, interests and estates are hereinabove specifically described; "Together with the right of ingress in, on and over the above described tracts of land, and any part thereof, and the right to use the surface of said lands, or any part thereof, for the purpose of conducting all operations thereon and thereunder necessary and incident to the prospecting for, developing, mining, producing, treating, saving, storing, transporting, and marketing of said sulphur from said above described tracts of land or any part thereof, together with the right to remove any and all fixtures and improvements placed thereon. "There is expressly reserved unto Grantors, their heirs, administrators, executors or assigns, forever, on sulphur hereafter produced and saved, that proportion of one and 60/100 ($1.60) Dollars per long ton of 2,240 pounds which Grantor's interest herein conveyed, in the sulphur fee simple estate in the tract of land from which sulphur is produced, bears to the entire sulphur fee simple estate in such tract; which said royalty shall be paid and distributed as follows: "To Arthur N. Trembley, or his heirs, administrators, *10 executors or assigns, one-third. "To Adele Trembley Wilson, or her heirs, administrators, executors or assigns, one-third. "To Corinne Trembley Barnes, or her heirs, administrators, executors or assigns, one-third. "If, subsequent to this conveyance, there is any change in ownership of the royalties herein reserved, or any part thereof, then, until delivery to Grantee, his heirs, administrators, executors, or assigns of a recordable instrument, or a certified copy of a recorded instrument, clearly evidencing such change, Grantee, his heirs, administrators, executors or assigns, shall, without liability, continue to pay all royalties which may accrue to the persons designated in this deed as the owners thereof. "It is stipulated that Grantee, his heirs, administrators, executors or assigns, shall never be under any obligation, either express or implied, to drill for, mine, produce, continue to produce, or attempt to produce sulphur from said land aforedescribed, or any part thereof, and all operations and development for the production of sulphur shall be solely at the election of the Grantee, his heirs, administrators, executors or assigns; provided, however, that Grantee obligates *11 himself, his heirs, administrators, executors or assigns, to reasonably protect said lands against drainage of sulphur, or, in the absence of such protection against drainage, to compensate the Grantors herein for their royalty interest on such sulphur in some suitable manner to be determined by mutual agreement, or, in the absence of such agreement, to be subject to determination by arbitration under the laws of the State of Texas. "It is stipulated, anything herein to the contrary notwithstanding, that Grantee, his heirs, administrators, executors and assigns, shall have the right at any time to reconvey to Grantors, their heirs, administrators, executors, or assigns, the rights, titles, interests and estates in the sulphur herein conveyed, or any interest therein, or part thereof, and in such event. Grantee, his heirs, administrators, executors and assigns, shall forthwith stand released from any and all obligations hereunder, express or implied, insofar as same shall relate to or affect such interest so reconveyed, except only as to accrued and unpaid royalties. "Grantee, his heirs, administrators, executors and assigns, shall have the right at any time to redeem for Grantors, *12 their heirs, administrators, executors and assigns, by payment of any deed of trust, tax judgment or other liens on the hereinabove described lands in the event of default of payment by Grantors, and in such event shall be subrogated to the rights of the holder or holders thereof. "TO HAVE AND TO HOLD the above described sulphur, sulphur rights, titles, interests and estates, together with all and singular, the rights, privileges, and appurtenances thereunto in anywise belonging unto the said E. G. Bartlett, his heirs, administrators, executors and assigns, forever, subject only to the royalties herein reserved and the provisions herein contained, and we do hereby bind ourselves, our heirs, executors and administrators to WARRANT AND FOREVER DEFEND ALL and singular said sulphur, sulphur rights, titles, interests and estates unto the said E. G. Bartlett, his heirs, administrators, executors, or assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof. "WITNESS our hands this 6th day of Dec., 1944. "S/Arthur N. Trembley "S/Corinne Trembley Barnes "S/Adele Trembley Wilson "S/E. F. Wilson" The instruments were duly and legally acknowledged, *13 and upon their execution and delivery to E. G. Bartlett, the grantee, he made a net cash payment to petitioners of $12,348.98, which was distributed among them as follows: Arthur N. Trembley, $4,528.70; Adele Trembley Wilson, $3,910.14; Corinne T. Barnes, $3,910.14. The petitioners each reported 50 per cent of the foregoing amounts in their respective income tax returns for 1944 as long term capital gains from the "sale of interest in property in Jefferson County, Texas, by warranty deeds dated December 6, 1944." The Commissioner, in his letters of deficiency, determined that these conveyances were not sales within the meaning of the Internal Revenue Code, but that they were leases, and amounts received by petitioners therefrom constituted bonuses or advance royalties taxable as ordinary income. He further held that petitioners were entitled to a depletion allowance of 23 per cent on the amounts so received, which he allowed in his computations, although petitioners had made no claim therefor. Were the instruments mineral leases for the exploitation and development of the sulphur contained in the lands, or were they mineral deeds making outright sales of all sulphur contained *14 in the land, subject to the fractional part reserved therein? [Opinion] In answering this question and in ascertaining the intention of the parties we may look not only to the language of the instruments, but to the subject matter, and to the circumstances surrounding the transaction when the instruments were executed. United States v. Peck, 102 U.S. 64, Merriam v. United States, 107 U.S. 437; United States v. Gibbons, 109 U.S. 200; Sand Filtration Corporation v. Cowardin, 213 U.S. 360. This rule of interpretation was applied in West v. Commissioner, 150 Fed. (2d) 723; certiorari denied, 326 U.S. 795 (cited by both parties), which affirmed 3 T.C. 431, where it was held for tax purposes that a transaction conveying the title to oil producing lands, in so far as the mineral rights were concerned, was a lease rather than a sale. There the transaction was based on a warranty deed and a contemporaneous supplemental contract which were parts of each other, and the contract obligated the grantee in the deed (the Humble Oil Company) to at once drill and develop the land for oil and specifically *15 determined that grantee owned 5/8 and grantor 3/8 of oil produced. The Circuit Court agreed with our holding that it was a leasing arrangement. A review of our opinion and that of the appellate court reveals that the principal reason for the conclusion reached was that the moving consideration for the transaction was to secure the immediate and complete development of the land for oil. After quoting from an opinion by the Supreme Court of Texas, in Danciger Oil & Refining Co. v. Powell, 154 S.W. (2d) 632, to the effect that "the most essential difference" "between a lease and a conveyance of minerals" is the fact that the predominating purpose of a lease is to secure the exploitation and development of the property for the purposes set out in the lease, we said: "* * * In our opinion the predominating purpose of the present contract was to secure the exploitation and development of the properties for oil, gas, and other minerals, a fact clearly evidenced by the care that petitioners exercised in drafting the duties, obligations, and covenants imposed on and accepted by Humble." The Circuit Court also said, "The purpose of the transaction was the production of oil", *16 and recited obligations of the grantee, among them the operation of four drilling rigs, to drill offset wells, to drill at least one well on each 20 acres in the proven area; that the land was then in part actual and in part probable producer of oil; that the "transferee was engaged in the oil business and interested in the properties only for developing the minerals, and the object of the transferor was to secure full development of the minerals." It was held that the technical language of conveyance, the absence of the forfeiture clause usually prevalent in a lease, etc., while material, were not determinative of the issue, but that for tax purposes, the intention of the parties was largely predominant. The facts in the instant case differ widely from those in the West case, supra, on the issue as to whether the transaction was a sale or a lease, and invoking the rule of interpretation there employed, we think a different result must be reached here. Clearly here the grantee did not propose to engage in the extraction of sulphur and petitioners did not expect it. Unlike the West case, neither the language of the instrument of conveyance nor the circumstances surrounding the transaction *17 when the instrument was executed so indicate. The grantee, instead of being obligated to drill for sulphur, was expressly exempted from so doing, the deed stipulating that the grantee, his heirs, assigns, etc.: "* * * shall never be under any obligation, either express or implied, to drill for, mine, produce, continue to produce, or attempt to produce sulphur from said land, or any part thereof, and all operations and development for the production of sulphur shall be wholly at the election of the grantee, his heirs, or assigns, etc. * * *" The only obligation on grantee as to development was "to reasonably protect said lands against drainage of sulphur", or, on failure so to do, to compensate the grantors "for their royalty interest on such sulphur" in some manner either by mutual agreement or arbitration. The provisions described color the transaction as a purchase of sulphur in the ground by the grantee for the purpose of investment, not an acquisition of mining rights which he expected to exercise. It is acquisition for the latter purpose which has been held to impress the conveyance with the character of a lease. A similar provision, viz: "the drilling of offset wells to *18 prevent drainage" was imposed on grantee in Danciger Oil & Refining Co. v. Powell, supra. There also the conveyance had no other requirement as to development. It gave the grantee the "right at any time to prospect for and develop oil" as is here done with reference to sulphur, [1] but the Court pointed out that other than this it was "absolutely silent" as to any provision requiring grantee to explore the land for the discovery of oil or to develop same after its discovery. And the Court held, "There is nothing in the instrument to indicate that its dominant purpose was to obtain an exploitation or development of the property for oil", and construed it to be "a conveyance of the minerals and not a lease." Here the facts more strongly reveal the absence of a leasing arrangement. The instrument in question, unlike the Danciger case, is not "silent" as to grantee's obligation to develop, but there is an affirmative and express stipulation that he shall never *19 be under any obligation, express or implied, so to do. This is wholly inconsistent with a predominant purpose to develop. Also indicative of a sale rather than a lease was the large cash consideration paid (over $12,000) of approximately $2,000 an acre for sulphur under land in wildcat or unproven sulphur producing area. The land involved and all land adjacent thereto had never produced sulphur, nor had ever been mined therefor up to and including four years after the instruments were executed. Payment of a large cash bonus for a mineral lease to permit the drilling of the land in purely wildcat territory is unusual, and much more consistent with the outright purchase of the minerals under such land, as the deeds here recite. The acquirement of title to minerals is obviously of far greater value and will bring a larger consideration than a mere leasehold right to develop; the former is continuous and permanent, while the latter is temporary and contingent. As was said in the Danciger case, supra, "conveyances of minerals are frequently actuated by a motive of investment on the part of the grantee and the cash consideration or other down payment is the moving cause for the conveyance *20 by the grantor." Such clearly was the purpose and intention of the parties to the instruments in question. The grantee was willing to pay a large cash sum to acquire the permanent title and ownership to the sulphur under the land, provided there was no obligation on his part to drill or develop same. The grantors, for this cash payment, were willing to part permanently with their title to the sulphur under the land, provided that in addition to the cash consideration, they could retain a royalty interest, if sulphur should ever be produced thereon. This reservation of royalty interest, while an attribute of a lease, is not controlling. As already pointed out, the essential prerequisite of a lease is that "its predominating purpose" is to secure the development of the land for minerals. The record here shows the absence of such a purpose. Furthermore, sellers of minerals may sell all or a fractional part of the minerals under a tract of land, and the reservation here, when considered with other language of the instruments and the circumstances surrounding their execution, indicates that the royalty interest reserved was a retention to that extent of the minerals sold. Respondent *21 in his brief says the cash payments to petitioners "were in the nature of cash bonuses or advance royalties taxable as ordinary income", but he frankly predicates this statement on the assumption of the correctness of his contention that the transactions were leasing arrangements rather than sales, with which, for the reasons given, we can not agree. Burnet v. Harmel, 287 U.S. 103, on which he relies, is clearly distinguishable. There, admittedly, the transactions involved were oil and gas leases, not sales, and the Supreme Court held that cash bonus payments for the granting of oil and gas leases could not be reported as gain from a "sale" of capital assets, but rather ordinary income. The Court held that such leases could not be desicribed as a sale of the mineral content of the soil, but rather a privilege to develop and exploit same, using this language: "* * * By virtue of the lease, the lessee acquires the privilege of exploiting the land for the production of oil and gas for a prescribed period; he may explore, drill, and produce oil and gas, if found. Such operations with respect to a mine have been said to resemble a manufacturing business carried on by the *22 use of the soil, to which the passing of title of the minerals is but an incident, rather than a sale of the land or of any interest in it or in its mineral content. * * *" Respondent here, seeking to justify his granting an unclaimed depletion allowance, says that petitioners, by reserving royalties, retained an economic interest in the sulphur which entitles them to depletion, and cites Palmer v. Bender, 287 U.S. 551. That case is not applicable here. There the transaction was based, not on the sale of minerals, but an assignment of oil and gas leases, which leases expressly required the development of the oil and gas under the land on which oil had been discovered and on which operations were then being carried on. There the taxpayer as lessee had discovered oil on the land and then transferred the leases to a third party "subject to the obligations and covenants of the lease" in consideration of a cash bonus and future payment to be made out of one-half of the oil produced and an additional "excess royalty" of one-eighth of oil produced. The Supreme Court held that it mattered not whether he was the lessor, sublessor or lessee, since "by virtue of the leasing transaction *23 he has retained a right to share in the oil produced" and that "production and sale of the oil would result in its depletion" and accordingly held that his interest should be "included within the meaning and purpose of the statute permitting deduction in the case of oil and gas wells of a reasonable allowance for depletion according to the peculiar conditions in each case." The facts in the instant case are materially different. The transactions here are not leases but sales, and the cash payments made are not "bonuses" or "advance royalties" but payments of the purchase price for the sulphur. Treasury Regulations 111, Sec. 29.23(m)-10, governing depletions, specifically authorizes the former, but is silent as to the latter. Here there is no operation or development for sulphur and no assurance that there will ever be. The grantee in the instruments here was not only not obligated to drill or develop the land, but he was expressly exempted from any obligation so to do. The mere ownership or sale of minerals does not entitle one to a depletion allowance under the statute, but it is the operation and development thereof which causes the depletion and for which depletion is granted. *24 As was said in Anderson v. Helvering, 310 U.S. 404: "The words 'gross income from the property', as used in the statute governing the allowance for depletion, means gross income received from the operation of the oil and gas wells by one who has a capital investment therein, - not income from the sale of the oil and gas properties themselves. Helvering v. Elbe Oil Land Co., 303 U.S. 372." The cash payments received by petitioners not being bonuses or advance royalties, but payments for the sulphur, such amounts were not subject to depletion and the Commissioner erred in so holding. Under the record we hold that the transactions were taxable as capital gains, and the respondent erred in his determination that they were taxable as ordinary income. Since one of the adjustments by the respondent in determining the deficiency is not contested. Decisions will be entered under Rule 50. Footnotes
1. Since oil and sulphur are both minerals found beneath the surface of the earth, unless the grantee has the use of the surface of the land necessary for development, a conveyance of minerals is of no value.↩