OPINION. Van Fossan, Judge: The question presented is whether all or any part of the moneys received by petitioner pursuant to an agreement entered into on April 1,1946, were proceeds from the sale of a capital asset or were ordinary income received under a lease agreement. On April 1, 1946, petitioner entered into an option agreement with the Bradley Mining Company granting Bradley sole option to purchase the Ima Mine properties from the petitioner for the total purchase price of $500,000. The pertinent details of the agreement appear in the Findings of Fact. Petitioner contends that the agreement constituted a sale of its interest in the Ima Mine properties and that it is entitled to capital gains treatment of all the proceeds received. In the alternative, petitioner contends that some portion of the proceeds received is entitled to, capital gains treatment. Bespondent argues that the option agreement entered into between petitioner and Bradley was, in reality, a lease and that the sums received pursuant thereto constituted ordinary income to the petitioner. The proper characterization of contracts for the disposal of mineral rights has long been a fruitful area for tax litigation. . • ■; In determining whether a particular transaction is a sale or lease we may look to the language employed by the parties, the subject matter, and the surrounding circumstances. Wesley W. West, 3 T.C. 431, 448 (1944), affd. 150 F. 2d 723 (C.A. 5, 1945). The key to the problem is whether the party disposing of the property right retained an economic interest in the property. Palmer v. Bender, 287 U.S. 551 (1933); Commissioner v. Southwest Expl. Co., 350 U.S. 308 (1956). After careful study of the agreement of April 1, 1946, and of the attendant circumstances, we are convinced and have found that petitioner retained no economic interest in the Ima Mine properties and that the agreement ivas a-contract of sale. The agreement itself is couched in terms descriptive of a sale. It gave Bradley sole option to purchase petitioner’s interests in the Ima Mine properties for the total purchase price of $500,000. Because of prior payments, the balance due at the time of the execution of the agreement was $380,000. This balance was to be discharged by annual payments of $25,000 each, to be made until the debt was satisfied. These payments were fixed and were wholly unrelated to production. In the event that the net returns from metals, minerals, and ores extracted by Bradley from the Ima Mine and the Mazda group of mining claims (adjoining Ima and for the working of which Bradley used Ima’s tunnels) exceeded $400,000 in any one year, Bradley ivas to pay petitioner 5 per centum of the excess. These payihents were termed royalties and were to be made in addition to the regular $25,000 payment and were to be applied on the $500,000 purchase price. Bradley, in fact, made annual payments of $25,000 to petitioner during each of the years ended March 31, 1947, through March 31, 1955, with the exception of 1948 when petitioner excused payment because of a fire at the mine. In addition, Bradley made payments equaling 5 per centum of production in excess of $400,000 during each of the years ended March 31,1951, through March 31, 1955. These payments, based on production, in no way altered the total purchase price. Their only effect was to hasten the time when the $500,000 obligation was satisfied. It was, in truth, unnecessary that petitioner look to production for the return of any part of its capital investment. Upon receipt of the final payment on March 31, 1955, the instruments conveying title to the properties were delivered from escrow to Bradley. The conveyance of title divested petitioner of all its fixed assets and it has not since conducted any business for profit. Bradley did not acquire a worked-out mine. At the time it obtained the instruments of title from the escrow holder a substantial quantity of hubernite ores remained en bloc in four of the Ima claims. We have held that the transaction here in issue constituted a sale of petitioner’s property rights in the Ima Mine, that petitioner retained no economic interest in the properties, and that petitioner was entitled to capital gains treatment on all the proceeds of the transaction.[3] This conclusion finds ample support in many decided cases. Helvering v. Elbe Oil Land Co., 303 U.S. 372 (1938); Barker v. Commissioner, 250 F. 2d 195 (C.A. 2, 1957); Crowell Land & Min. Corp. v. Commissioner, 242 F. 2d 864 (C.A. 5, 1957), reversing 25 T.C. 223; Maude W. Olinger, 27 T.C. 93 (1956); Charles H. Remer, 28 T.C. 85 (1957), affd. 260 F. 2d 337 (C.A. 8, 1958). Respondent relies heavily on this Court’s opinion in Lincoln D. Godshall, 13 T.C. 681 (1949). That case is similar to the case at bar in that there, as here, title deeds to mining properties were placed in escrow to be delivered to a mining company upon final satisfaction of a fixed sum. There is, however, a crucial difference. In Godshall the annual payments were payable solely out of the proceeds of mined ores. Here, the annual payments of $25,000 were due, regardless of production. Respondent asserts that the agreement between petitioner and Bradley cannot be regarded as a contract of sale since it was devoid of a forfeiture provision. Bradley could abandon the agreement by giving petitioner 30 days’ notice, making certain payments, and surrendering possession of the property. This same factor was present in Helvering v. Elbe Oil Land Co., supra, and Barker v. Commissioner, supra. It was not regarded as controlling in those cases and we do not so regard it here. Moreover, it should be noted that Bradley could not abandon the agreement so long as it owned, possessed, or controlled the Mazda group of mining claims. Our holding on petitioner’s primary contention makes it unnecessary for us to consider Ms alternate theories. Decision will be entered for the petitioner. See section 117 (a) of the Internal Revenue Code of 1839 and section 1221 of the Internal Revenue Code of 1954.