MAUDE W. OLINGER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58757.  Filed October 22, 1956.

*Thomas D. Mustard, Esq.*, and *James D. Dye, Esq.*, for the petitioner.

*Marvin E. Hagen, Esq.*, for the respondent.

OPINION.

KERN, *Judge:* The question presented in this case is whether the payment of $202,500 received by petitioner in 1951 was an advance royalty under a mining lease, as determined by respondent, or was gain realized from the sale of a capital asset, as contended by petitioner. The solution of this question requires us to consider whether the transaction evidenced by the written instrument dated October 5, 1951, described in our findings, effected a leasing arrangement of the property for which the payment was made, or a sale thereof. "In construing the contract we may look not only to the language employed, but to the subject matter and surrounding circumstances, and we may avail ourselves of the same light which the parties possessed at the time the contract was made." *Wesley W. West*, 3 T. C. 431, 448, affd. 150 F. 2d 723.

In three recent cases we have considered similar problems: *William Louis Albritton*, 24 T. C. 903; *Arthur S. Barker*, 24 T. C. 1160; and *Crowell Land & Mineral Corporation*, 25 T. C. 223. In those cases the taxpayers granted to another the right to exploit certain deposits or minerals from lands which they continued to own, the parties contemplated that payments to the taxpayers would be made from the results of such exploitation, and the terms of the exploitation rights were either for definite periods of time or were subject to forfeiture, the taxpayers retaining a reversionary interest in the property covered by the grant. As we said in *Crowell Land & Mineral Corporation*, *supra*, p. 225, "Payment for deposits only as removed and retention (or retransfer) of title to the balance are typical indicia of the existence of an economic interest," i. e., typical indicia of a lease transaction rather than a sale.

In the instant case, unlike the three cases cited above, petitioner conveyed in perpetuity to the grantee her fee interests in the property in question, retaining no reversionary rights whatever, and the payment received by her in 1951 was not contingent upon and had no relation to any exploitation of the mineral contents of the property by the grantee. The large cash payment to petitioner was received by her in consideration for her conveyance to the grantee in fee of all her interests in the property conveyed, without any obligation on the part

of the grantee to remove from the property any ore at any time. As late as January 26, 1956, the grantee had not mined any ore from the property. The grantee was interested in acquiring the property as an ore reserve and there is nothing in the record indicating that it contemplated the mining of iron ore therefrom during the lifetime of petitioner. Therefore the dominant motive of petitioner in entering into the transaction evidenced by the written instrument of October 5, 1951, was not to secure the exploitation and development of her property for mining purposes. Cf. *Wesley W. West, supra.* Petitioner, being a widow 74 years of age, was only willing to enter into a lease arrangement with regard to the property if she could get "a guaranty for a certain quantity [of iron ore] to be mined each year." The instrument in question contains no such provision and the record indicates that Sheffield, which was interested in acquiring the property as a reserve, would not have been interested in the transaction if it carried with it any such obligation.

We conclude that the facts of the instant case distinguish it from the three cases above cited, that the written instrument executed October 5, 1951, effected a sale of the property rather than a lease, and that this was in conformity with the intent of the parties.

Respondent contends, however, that a part of the instrument reserved to petitioner an economic interest consisting of the right to receive 25 cents a ton on all iron ore mined from the property in excess of 800,000 gross tons and that therefore the payment of $202,500 received by petitioner in 1951 necessarily constituted an advance royalty payment includible in petitioner's income for that year as ordinary income, within the doctrine of *Palmer* v. *Bender*, 287 U. S. 551.

It should be pointed out that the provisions of the "Conveyance of Iron Ore and Iron Ore Rights" upon which respondent relies in this contention only apply to the possible excess of iron ore on the property over the amount of 800,000 gross tons estimated by Sheffield's officers to be present on the property, and because petitioner felt, on account of some notes left by her deceased husband, that there might be such an excess. It should also be noted that the price to be paid to her for such possible excess of iron ore was determined with reference to the amount paid her for the 800,000 tons estimated to be on the property ($200,000 divided by 800,000, or 25 cents a ton) and that her possible rights to payment for such excess expired within 50 years.

In our opinion it is clear from the entire record that there was an absolute and immediate sale in 1951 by petitioner to Sheffield of her surface rights and her rights to iron ore on the properties involved, that the money received by her in that year was in payment for the surface rights and rights to iron ore in the amount of 800,000 tons

or less, and that no part of such payments depended upon, related to, or was applicable on moneys due from the possible production of iron ore from the properties in excess of 800,000 tons within 50 years, as advance royalties or otherwise.

It is unnecessary for us to determine whether, if Sheffield did produce within 50 years after 1951 iron ore from these properties in excess of 800,000 gross tons, the payments made therefore would be considered as adjustments to the purchase price or as royalties under *Palmer* v. *Bender, supra.* That question is not entirely free from doubt since there is here a complete and immediate conveyance of all of petitioner's interest in the property involved, i. e., surface rights and rights to iron ore, for a substantial cash payment not dependent upon or related to the successful exploitation of the property by the grantee. See *Helvering* v. *Elbe Oil Land Development Co.,* 303 U. S. 372. Cf. *Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25. In any event, we do not here decide it.

Reviewed by the Court.

*Decision will be entered for petitioner.*

———

LeMire, *J.,* dissenting: I am unable to distinguish the instant proceeding in principle from *Burnet* v. *Harmel,* 287 U. S. 103; *Palmer* v. *Bender,* 287 U. S. 551; *Bankers Pocahontas Coal Co.* v. *Burnet,* 287 U. S. 308; *Otis A. Kittle,* 21 T. C. 79, affirmed per curiam 229 F. 2d 313; *Arthur S. Barker,* 24 T. C. 1160, on appeal C. A. 2; *Crowell Land & Mineral Corporation,* 25 T. C. 223, on appeal C. A. 5.

I interpret those cases to hold that where any part of the consideration for the transfer of mining rights is based on production, an economic interest is retained and the payments received constitute ordinary income.

The record shows that the parties were at considerable variance as to the probable commercial ore content of the lands in which petitioner held mining rights. The negotiations leading up to the execution of the contract indicate that petitioner was willing to either sell or lease on a basis of 1,224,286 tons, and that Sheffield preferred a mining lease based on its estimate of 800,000 tons. Based on a unit price of 25 cents per ton, the difference in the total consideration to be paid would amount to $100,000, or one-third more than the payment of $200,000 which petitioner received in the taxable year involved. The reservation in the agreement was to protect petitioner in the event more than 800,000 tons were mined, and in my opinion requires the contract to be construed as a leasing arrangement.

The contract provides for a consideration of $1 and other good and valuable consideration. The ultimate amount of consideration to

be received by petitioner can be ascertained only on the basis of production. In a sale all the absolute and unqualified rights pass. If strings are attached, something other than a sale emerges.

The fact that the advance payment was large bears on the hardship involved but does not furnish a legal basis for altering the determinative principle of law to be applied. Therefore, I respectfully dissent from the conclusion reached in the majority opinion.