CHARLES H. REMER AND DOROTHY A. REMER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57593, 57594, 59035. Filed April 19, 1957.

---

[1] Proceedings of the following petitioners are consolidated herewith: Charles H. Remer, Docket No. 57594; Charles H. Remer and Dorothy A. Remer, Docket No. 59035.

*Amasa E. Wheeler, Esq.*, and *Hayner N. Larson, Esq.*, for the petitioners.

*Frank C. Conley, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in income tax and additions to tax:

| Docket No. | Petitioner | Year | Deficiency | Additions to tax sec. 294 (d) (1) (A) |
|---|---|---|---|---|
| 57593 | Charles H. Remer and Dorothy A. Remer | 1948<br>1949 | $14,625.36<br>17,787.02 | |
| 57594 | Charles H. Remer | 1947 | 47,169.21 | |
| 59035 | Charles H. Remer and Dorothy A. Remer | 1950<br>1951<br>1952 | 5,794.27<br>7,915.26<br>7,256.26 | <br>$3,303.34<br> |

The questions for decision are (1) whether certain payments received by petitioners as the result of the transfer of rights in iron ore mining leases are taxable as ordinary income or as long-term capital gains and (2) whether petitioners are liable for additions to tax under section 294 (d) (1) (A). Other adjustments which are uncontested may be made under Rule 50.

All of the facts have been stipulated, are so found, and the stipulation is included herein by reference.

The petitioners Charles H. and Dorothy A. Remer have been husband and wife since 1948 and are residents of Hibbing, Minnesota. Charles filed a separate return for 1947, and the two filed a joint return for each of the years 1948 to 1952, inclusive. Their books were kept and the returns filed according to the cash method of accounting.

Issued to Charles by the State of Minnesota on July 11, 1945, were two written documents, each entitled "Stockpiled Iron Ore Prospecting Permit" and identical to the other except as to number and description of the property to which it related. One was permit No. SP–101 and the other permit No. SP–102. The latter, omitting such property description, was as follows:

STATE OF MINNESOTA

STOCKPILED IRON ORE PROSPECTING PERMIT

Permit No. SP–102

At the sale of stockpiled iron ore prospecting permits held by the State of Minnesota, acting by and through its Commissioner of Conservation and Executive Council, under the provisions of Minnesota Statutes 1941, Sections 93.16 and 93.17 and Laws of 1945, Chapter 342, at 11 o'clock in the morning of the 11th day of June 1945.

Chas. H. Remer, of Hibbing, Minnesota, having offered the highest rate of royalty for the right to remove stockpiled iron ore on that tract or parcel of land in St. Louis County, State of Minnesota, described as follows, to-wit:

[Description omitted]

and being a stockpiled iron ore mining unit as designated by the Commissioner of Conservation, and said Chas. H. Remer having paid the treasurer of the State of Minnesota the sum of Fifty Dollars;

Now, THEREFORE, in consideration of the premises, the undersigned, as Commissioner of Conservation, pursuant to the provisions of Laws 1945, Chapter 342, hereby grants to the said Chas. H. Remer for the period of one year from July 11, 1945, the right to enter upon said land for the purpose of prospecting and exploring the stockpiled iron ore as authorized by Laws 1945, Chapter 342.

The rights, duties and obligations of the holder of this permit are as set forth in Laws 1945, Chapter 342, Sections 3, 4 and 5, and, in the event that a mining lease is issued in the form prescribed by Laws 1945, Chapter 342, Section 5, then the rates of royalty to be paid to the State of Minnesota shall conform to the bid offered by Chas. H. Remer to whom this permit is issued.

This permit will expire at 5 o'clock p. m. on the 10th day of July 1946.

The stockpiled iron ore referred to in the permit represented the residue of prior mining. The documents evidencing the permits were transmitted to Charles with a letter from the Director of the Division of Lands and Minerals of the State Department of Conservation wherein appeared the following paragraph:

We enclose two copies of Laws 1945, Chapter 342, and call your attention to Section 3 setting forth the duties and obligations of the permit holder and providing that the work of prospecting shall begin within 6 months unless a lease is asked for. Also enclosed are two copies of Minn. Stat. 1941, Sec. 93.19 outlining the manner in which you may receive from the Commissioner of Conservation a state mining lease under your permit.

The two permits were held by Charles continuously until their expiration.

On July 10, 1946, the date of expiration of the permits, the State issued to Charles 2 written leases. Each was entitled "Stockpiled Iron Ore Mining Lease Issued under Laws of 1945, Chapter 342." Each was identical to the other except that the one was designated lease No. TSP–301, referred to permit No. SP–101, and covered only the property to which this permit related, whereas the other was designated lease No. ISP–201, referred to permit No. SP–102, and covered only the property to which this latter permit related.

Each lease document recited that the State did thereby "lease and demise" the property in question to Charles "for the term of fifty (50) years * * * for the purpose of exploring, mining, and removing the iron ore stockpiled on said land," granting him also the right to construct such buildings, roads, and "other improvements" upon the premises "as may be necessary or suitable for such purposes." The State at the same time reserved power to sell timber on the property, to grant railroad rights-of-way, and to lease the surface, in all in-

stances in such manner as not "unnecessarily or materially" to "interfere with the mining operations."

Charles on his part covenanted to pay the State a "rental" of $312.50 for each quarter "during the first year of this lease * * * and a quarterly rental thereafter during the entire term this lease remains in force of $1,250; provided, that the total amount of royalty due on stockpiled iron ore removed and accounted for during said first year as provided for hereafter does not equal or exceed the sum of $1,250 during the first year as above provided, and the sum of $5,000 per annum thereafter, it being the purpose of this covenant to secure a regular annual income from the demised premises of not less than $1,250 during the first year and $5,000 thereafter in rentals or royalty on stockpiled iron ore, or both." There followed "schedules of minimum royalties," which varied according to type of natural ore removed or concentrate produced and ranged upwards from a minimum of 12 cents per gross ton.

Provisions were then set forth relating to such subjects as payment dates, reports and statements, mailing and furnishing of ore samples, weighing, beneficiation, stockpiling of concentrates, inspection and inspection facilities, and payment of taxes assessed against the land and improvements thereon, following which it was stated that "the party of the second part [Charles] shall have the right at any time to terminate this lease in so far as it requires the party of the second part to mine stockpiled ore on said land, or to pay royalty therefor, by delivering written notice of such intention to terminate to the commissioner of conservation * * *, and this lease shall terminate sixty days thereafter, and all arrearages and sums which shall be due under this lease up to the time of such termination shall be paid upon settlement and adjustment thereof by the party of the second part." The lease provided also that "if any quarterly payment or any payment for royalties * * * shall remain unpaid" for 60 days after the due date, or if the lessee "shall fail to perform any of the covenants or conditions" placed upon him, "then it shall be the duty of the commissioner of conservation to cancel this lease," first giving 20 days' written notice, whereupon the State "shall re-enter and again possess said premises as fully as if no lease had been given * * *, and the party of the second part and all persons claiming under such party shall be wholly excluded therefrom, but such re-entry shall not work a forfeiture of the rents, royalties or taxes or other sums to be paid at the time of such re-entry." The lessee was given 90 days following termination of the lease, "whether by act of either party or by limitation," within which to remove machinery and structures installed by him, but he was forbidden to remove supports and tramways on or within the stockpiles themselves. The State reserved "a lien upon

all stockpiled ore mined, treated or beneficiated, and upon all improvements made by the party of the second part upon the premises, for any unpaid balances due under this lease." The lease provided in conclusion that its "covenants, terms and conditions * * * shall run with the land and be in all respects binding upon all sublessees and grantees under the party of the second part."

At all times since before 1943 Charles and his father, E. F. Remer, have been the owners of all the outstanding capital stock, 333 common shares, of Charleson Iron Mining Company, a Minnesota corporation engaged in the business of mining and concentrating iron ore; 167 of the shares have been owned by the father, and 166 by Charles. At a directors' meeting in November 1946, reference was made to approaching exhaustion within a possible 2 years of a mine known as Missabe Mountain Mine which the corporation was then operating on State-owned land under lease and to the consequent necessity of acquiring new operating property; and in this connection there was discussion of acquisition of 1 of the 2 State leases issued to Charles on July 10, 1946. However, no action was taken other than to direct continuation of experimental work on the property which the company had begun during the summer and the securing of information bearing on "probable costs" of operation, including construction of a concentrating plant.

The 2 leases issued to Charles as aforesaid on July 10, 1946, were owned by him continuously at least until and including November 20, 1947, and were "capital assets" within the meaning of that term as defined in section 117 (a) (1) of the Internal Revenue Code of 1939. On the latter date, Charles made and Charleson Iron Mining Company accepted an offer relating to the 2 leases, the offer and acceptance being recorded as follows in the minutes of a company directors' meeting held on said date:

Charles H. Remer then offered to assign to the company State Stockpiled Iron Ore Mining Leases Nos. ISP–201 and TSP–301 covering Stockpile Mining Units LT 1 and LT 2, located on Section 16–58–17, in consideration of a total purchase price to be paid and allowed as follows:

(a) $100,000.00 to be paid in cash upon the execution and delivery of assignments of said leases,

(b) $50,000.00 to be paid in cash on or before November 30, 1948,

(c) $50,000.00 to be paid in cash on or before November 30, 1949, and

(d) The sum of 10¢ for each long ton of ore or concentrates shipped from said properties pursuant to said mining leases, said sum of 10¢ per ton to be payable quarterly on the 20th days of January, April, July and October of each year for all such ore or concentrates shipped therefrom during the preceding quarter.

The President reported to the meeting the result of experimental work which had been conducted by the company on the material contained in the stockpiles covered by said leases; that tests had indicated that the material in said stockpiles could be profitably beneficiated with a resulting gross profit before de

preciation and taxes of approximately 87¢ per ton of concentrate; that the cost for an adequate beneficiating plant capable of producing an annual tonnage of approximately 115,000 tons of concentrate would be approximately $200,000.00, and could probably be made ready for operation for the entire shipping season of 1949.

On motion duly made, seconded and unanimously carried, it was determined to accept the proposal made by Charles H. Remer as above set forth, and the proper officers were authorized to execute any and all instruments necessary to carry the same into effect.

On the same day, November 20, 1947, Charles and the company executed, with respect to each of the leases, a written instrument entitled "Assignment of Lease." To each such instrument the commissioner of conservation on November 25, 1947, appended a statement that "[t]he foregoing assignment of Iron Ore Stockpile Lease * * * is hereby approved as to form and execution." On November 26, 1947, the attorney general appended a statement that "[t]he foregoing approval was examined and approved as to form and execution." Appended also was a certificate by the commissioner that the instrument was filed for record in his office on November 28, 1947, and "was duly entered" in Mineral Lease Royalty Record Book "F" on a stated page. The 2 instruments were identical except that one referred to lease No. TSP–301 and described the property to which said lease related, whereas the other referred to lease No. ISP–201 and described the property to which this lease related. Omitting recitals and other formal parts, the latter read as follows:

1. Party of the first part [Charles] does hereby sell, assign, transfer and set over unto the said party of the second part [the company], its successors and assigns, said stockpiled iron ore mining lease No. ISP–201 and does hereby convey and grant unto said party of the second part, its successors and assigns, the leasehold estate created thereby, and the said party of the first part, for himself, his administrators, heirs, executors and assigns, does hereby covenant unto and with the said party of the second part, its successors and assigns, that he, the party of the first part, at the time of the making and delivery of this indenture is the owner of said stockpiled iron ore mining lease as lessee therein, and is well seized of the said leasehold estate and has a good and perfect title to the same; that the same is free from all liens and incumbrances; that said stockpiled iron ore mining lease is in full force and effect, valid and subsisting and not subject to forfeiture or termination by the lessor therein; and that the party of the first part, his administrators, executors, heirs and assigns, will warrant and defend the party of the second part, its successors and assigns, in the quiet and peaceable possession of said leasehold estate against any and all persons claiming or to claim the same or any part thereof.

2. The party of the second part hereby accepts said assignment and covenants and agrees to indemnify, protect and save harmless the first party against any liability hereafter accruing under said stockpiled iron ore mining lease.

Each instrument was signed by both parties, and each party signed in the presence of two witnesses and acknowledged his execution of the instrument before a notary.

During each of the years 1947 to 1952, inclusive, payments as set out in the minutes quoted above from the directors' meeting of November 20, 1947, were made by the company to Charles as follows:

Year                          *Payment*

1947____$100,000, being the payment required by clause (a) of said minutes.

1948____$50,000, being the payment required by clause (b) of said minutes.

1949____$63,207.10, being the total of the $50,000 payment required by clause (c) of said minutes and of $13,207.10 in payments of the kind required by clause (d) of said minutes.

1950____$18,201.70 in payments of the kind required by said clause (d).

1951____$19,897.10 in payments of the kind required by said clause (d).

1952____$17,733.40 in payments of the kind required by said clause (d).

The basis to Charles of the 2 leases was their cost, which on November 20, 1947, was $3,472.15. In his separate return for 1947 he reported $96,527.85 as long-term capital gain, being the excess of the foregoing 1947 payment over such basis. In their joint return for each of the years 1948 to 1952, inclusive, Charles and Dorothy reported as long-term capital gain the whole of the payment or payments received in such year as aforesaid.

The Commissioner of Internal Revenue in his notices of deficiency determined that the payments so received by Charles were subject to tax as ordinary income and not as long-term capital gain after allowing the following amounts as amortized leasehold costs:

| Year | Amount |
| --- | --- |
| 1947 | $1,278.58 |
| 1948 | 639.29 |
| 1949 | 808.15 |
| 1950 | 232.72 |
| 1951 | 254.40 |
| 1952 | 226.74 |

The above amount so determined with respect to each year was arrived at by the Commissioner by multiplying $3,472.15, the basis of the 2 leases to Charles, by the percentage which the whole of the payment or payments received during such year as aforesaid was of 271,562.40. This number, 271,562.40, represents the long tons of ore estimated by the Commissioner as of November 20, 1947, to have been recoverable from the properties covered by the 2 leases.

The Commissioner's contentions are, first, that "[t]he language used in a written agreement in describing the consequences of the parties acts is not always controlling for taxing purposes" and, second, that petitioner "after transferring certain rights retained an economic interest in the stockpiled iron ore and concentrates and therefore did not sell the right he had previously acquired."

With the first proposition we readily agree, and so do petitioners.

With reference to the second proposition, the courts have generally treated the problem of whether the taxpayer has "sold" the asset and

hence is entitled to treat the proceeds as capital gain or whether he has retained an "economic interest" with the consequence that the amounts received are taxable as ordinary income, as a problem related to a depletion allowance. William Louis Albritton, 24 T. C. 903. Accordingly, cases dealing with the latter question are pertinent here. Nevertheless the problem of reconciling the decisions and drawing from them a principle for disposing of the case at hand is not an easy one, as this Court recently indicated in Maude W. Olinger, 27 T. C. 93. Of necessity, in reaching our conclusion, we must look to the language employed by the parties, the subject matter, and the surrounding circumstances. Wesley W. West, 3 T. C. 431, affd. 150 F. 2d 723.

Here the taxpayer had held two "Stockpiled Iron Ore Mining Leases" (by stipulation "capital assets" within the meaning of section 117 (a) (1), I. R. C. 1939) for more than 6 months. The essential terms of the leases have been summarized above. On November 20, 1947, the taxpayer executed "Assignments" of the leases whereby he purported to "sell, assign, transfer and set over" and "does hereby convey and grant" the leaseholds to his transferee in return for $100,000 cash paid on the date of the assignment; $50,000 cash to be paid on or before November 30, 1948; $50,000 cash to be paid on or before November 30, 1949; and the sum of 10 cents per ton of ore to be shipped from the premises. The language employed by the parties is absolute in its terms; no reversionary interest is retained by Charles, the transferor; he had no right to control the production of ore, or to reacquire the leasehold under any circumstances; and, were it not for his contractual right to be paid so much per ton for ore to be shipped in the future, we would have no trouble in concluding that he had retained no "economic interest" in the properties and that what he received for his assignment should be taxed as capital gain.

We have carefully studied all of the cases cited by the parties. They are numerous and some are relied on by both parties. To analyze each and point out distinctions would needlessly prolong this Opinion. It is sufficient to say that we think the facts in Helvering v. Elbe Oil Land Co., 303 U. S. 372, and Maude W. Olinger, supra, bring those cases closer to this case than any of the others cited. In both of those cases it was indicated that where mineral leases were transferred with large initial payments, sales resulted despite the fact that the transferor was also to receive deferred payments measured by a percentage of profits or a specified payment per unit of ore extracted.

Here, Charles's investment, or the basis to him of the leases, was but $3,472.15. By the time the large cash payments of $100,000 in 1947, $50,000 in 1948, and $50,000 in 1949 had been made, he had already recouped his investment many times over. None of these payments was dependent upon operation of the properties. He had no control over the shipment of ore and so far as we can determine

from the facts the transferee of the leases was under no obligation to Charles to ship any ore whatsoever. Somewhat similar deferred payment provisions did not prevent transfers of mineral properties from being treated as sales in the *Elbe* case, *supra*. A like result has been reached in a case involving the transfer of patents and inventions where the transfer was made in consideration of payments based upon future production by the transferee, *Commissioner* v. *Hopkinson*, (C. A. 2) 126 F. 2d 406, affirming 42 B. T. A. 580; see also *Vincent A. Marco*, 25 T. C. 544; and in a case dealing with the transfer of a bus franchise, *Vermont Transit Co.* v. *Commissioner*, (C. A. 2) 218 F. 2d 468, affirming 19 T. C. 1040. In the *Hopkinson* case this kind of transaction was characterized as follows (p. 410):

This manner of paying for the property by the purchaser was but an installment plan which did not lessen the full and complete title to the property which was transferred to the purchaser and which gave it the rights of an absolute owner. Helvering v. Elbe Oil Land Development Co., 303 U. S. 372, 58 S. Ct. 621, 82 L. Ed. 904; Littlefield v. Perry, 21 Wall. 205; 88 U. S. 205, 22 L. Ed. 577; Rude v. Westcott, 130 U. S. 152, 9 S. Ct. 463, 32 L. Ed. 888; Green v. Le Clair, 7 Cir., 24 F. 2d 74. Consequently, payments received by the seller after his basis had been extinguished would have been taxable to him as capital gains from the sale of property. Burnet v. Logan, 283 U. S. 404, 51 S. Ct. 550, 75 L. Ed. 1143.

We conclude that the transfers of the leases were absolute sales and that the payments made to Charles, both the large downpayments and the 10 cents per ton, were properly treated by him as capital gains. This goes a step farther than it was necessary to go in *Olinger*, but we find nothing in that case to indicate that our conclusion here should be otherwise.

Petitioner introduced no evidence on the section 294 (d) (1) (A) issue; nor was it argued on brief. We deem the issue abandoned.

*Decision will be entered under Rule 50.*