Nathaniel C. **WOOD** and Gertrude L. Wood, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 22693.

United States Court of Appeals Fifth Circuit.

May 11, 1967.

---

Clarence P. Brazill, Jr., Nelson, Mc-Cleskey & Harriger, Lubbock, Tex., for appellants.

Mitchell Rogovin, Asst. Atty. Gen., John B. Jones, Jr., Act. Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Meyer Rothwacks, Melva M. Graney, Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., Melvin M. Diggs, U. S. Atty., Dallas, Tex., Richard M. Roberts, Acting Asst. Atty. Gen., Washington, D. C., for appellee.

Before RIVES, BELL and THORN-BERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal presents a question of proper tax treatment of compensation received under a contract permitting removal of sand and gravel from appellant taxpayer's land. Taxpayer argues that the contract was in essence a sale of the minerals in place and that payment received should be taxed as long-term capital gains. The government argues that the contract constituted a mineral lease and that the payments received are taxable as ordinary income subject to a five per cent depletion allowance. The district court held for the government. We affirm.

Mr. and Mrs. Wood own 14,088 acres of land in Crosby County, Texas. Since the date of purchase in 1950, Mr. Wood has used the land for ranching.[1] Shortly after purchasing the land Mr. Wood entered into a five-year contract with Chancey-Dickey Materials Company for the purpose of exploiting deposits of sand and gravel known to exist on the ranch. As the date for expiration of this contractual agreement neared, Noble

---

1. Mrs. Wood is a party to this litigation merely because a joint tax return was filed. She has played no active part in any of the business transactions relevant to the resolution of this controversy.

W. Prentice and his associates,[2] being in the sand and gravel business, approached Mr. Wood in an effort to reach some agreement whereby Prentice could exploit the sand and gravel deposits.

Negotiations between Wood and Prentice resulted in a contractual agreement, entitled SAND, GRAVEL AND ROCK LEASE, whereby Wood did "grant, lease, and let" to Prentice the exclusive right to mine sand, gravel and rock on his ranch for an indefinite period.[3] Pursuant to the agreement, Prentice moved upon the taxpayer's land and commenced

2. Hereinafter referred to as "Prentice."

3. The contract between taxpayer and Prentice provided:

The parties hereto mutually agree, as follows:

(1) Second Party [lessee] may place upon said premises any and all machinery, equipment, structures, roads, railroad and such other things which may be necessary or convenient for use in mining, processing, loading and transporting sand, gravel and rock, and for such other operations as may be incident to the drilling, exploration, mining, processing and removing of such materials. Second Party after the termination of this lease, for whatsoever cause, is hereby expressly granted a reasonable time within which to remove such property and objects so placed upon said premises by it, not to exceed ninety (90) days, and agrees to give peaceable possession at the end of that time. Any and all such property and objects placed upon the premises shall remain personalty and shall never be considered part of the realty as by attachment to the soil.

(2) Second Party may build dams to impound water necessary to the proper washing of sand and gravel, or drill water wells, or excavate existing springs (with the permission of Clark Wood as to existing springs) or seepage water or dig pits in the river bottom or adjacent thereto to secure water, and lay all necessary water lines, construct power lines for pumping or plant operation and do all other things reasonable and necessary on the land to secure efficient and economical production.

(3) This lease and rights granted herein shall endure and run from the 1st day of October, 1955 and thereafter according to the terms of the next paragraph, and Second Party shall be given a reasonable time after notice to perform any of the actual or implied covenants, conditions or stipulations during the term of this lease.

(4) First Party agrees to protect the Second Party in the peaceful possession of the premises here let, for the purpose of mining, processing and removing sand, gravel and rock only for so long as sand, gravel and rock is produced from said land and the First Party receives a minimum of $15,000.00 per year from royalty from sales of sand, gravel and rock and/or supplemental payment by Second Party to produce said annual minimum if royalty payments above are insufficient to meet said annual minimum royalty guarantee. Second Party agrees to pay First Party on October 1, 1955 an advance royalty payment of the same amount he received for the month of October of 1954, and the same amount for each month thereafter as he received the prior year until Second Party begins production and sales to be recovered by Second Party out of royalty becoming due to First Party until recouped.

(5) In the event of a national emergency or calamity, such as severe depression where sales are reduced, or war, during which time production and sale of construction materials are controlled, or greatly reduced and it is not possible for Second Party to sell materials profitably or in quantities sufficient to meet the minimum royalty guarantee, Second Party may give First Party written notice of ninety days (90 days) that Second Party cannot continue to comply with the minimum guarantee and be relieved from the running of said minimum under this contract for the duration of said emergency or calamity period.

(6) Second Party agrees to save whole and hold harmless First Party from any liability which may result from the acts or omissions of Second Party, his employees or agents resulting from anything Second Party may do on the subject premises or as a result of this lease agreement.

(7) Second Party agrees to build and maintain and keep cleaned out, cattleguards at any point where it's [sic] necessary roads may cross fence lines. Where First Party needs roads across Second Party's roads, then Second Party will keep barrow ditches at said crossing filled up to road crossing level so First Party may cross in any motor vehicle.

(8) Second Party agrees to consult with First Party before changing pit locations or move plant location or do other things which might withdraw or

operations. In 1958, 1959, and 1960 Wood received as consideration under the agreement the respective sums of $85,078.32, $140,426.72, and $114,006.72 which, less annual allowances for depletion of five per cent, were reported in his income tax returns as gravel royalties and taxed as such by the Commissioner.[4]

In March, 1962, Wood filed amended returns for the years 1958, 1959 and 1960, asserting overpayment of income tax and claiming refunds.[5] Taxpayer's action was based on the theory that the royalty receipts under the lease agreement were actually income from the sale of a capital asset. Taxpayer's claim for refund was disallowed by the Commissioner and this action was subsequently filed. On November 13, 1964, the district court heard the case, sitting without a jury, and on April 23, 1965, the court entered judgment dismissing taxpayer's suit on the merits.

The central question upon which appellant's tax liability must turn is whether he has, by his contractual relation, retained an interest in the minerals

destroy more land for First Party's use and enjoyment.

(9) Second Party agrees to hard surface its haul road from the plant to the exit gate from the ranch toward Slaton, and Second Party agrees to replace to Lessor or to the Lessee holding said lease at the date of this lease, if either furnishes to the Texas Highway Department or the Counties of Crosby and/or Lubbock gravel to hard surface the road from Slaton east to the entrance to said ranch without charge, or such portion thereof as is furnished free.

(10) Second Party agrees to operate upon said premises in an orderly and workmanlike manner, and shall disturb First Party and his tenants as little as reasonably possible in their normal use of said land for farming and grazing.

(11) Nothing in this contract shall be construed as an oil and gas lease, and First Party expressly retains the right to lease said premises, or any part thereof, for oil and gas, but it is expressly agreed and understood that the rights created in any lessee in such oil and gas lease, shall be subject to all the rights and privileges created in Second Party herein, under the terms of this agreement.

(12) Second Party, in consideration of the rights herein granted by First Party, agrees and obligates himself to pay to First Party, as hereinafter stated, a royalty on each and every cubic yard of sand, gravel and rock mined on and removed from the premises, which royalty shall be twenty-five cents (25¢) per cubic yard.

(13) Royalty payments shall be based on truck measurements at destination or if shipped by railroad, railroad weights to govern and yardage shall be computed on a basis of 2800 lbs. per cubic yard. All material processed shall remain the property of Second Party until removed from premises, and Second Party re-serves the right to remove such processed materials after termination of this lease by payment of the cubic yard royalty herein set forth, and the right of ingress and egress to remove said processed materials.

(14) Second Party by these presents obligates itself to keep a full, true, and accurate record of all sand, gravel, and rock mined and removed from said premises, and agrees that said First Party shall have free access to such records during all business hours, and based upon such records, said Second Party obligates himself to mail to Clark Wood before the 15th day of each month at Slaton, Texas, a statement showing the quantity of material removed from premises during the preceding calendar month, which statement shall be accompanied by the amount due as hereinabove provided.

(15) This lease and all its terms, conditions and stipulations shall extend to and be binding on all successors, heirs and assigns of said First Party or Second Party. Second Party must secure written agreement of Clark Wood before any sale or assignment of this lease is consummated, but it is specifically agreed that this reservation is made to Clark Wood, only, and that in the event he sells the ranch the Second Party may sell or assign the lease, subject to its terms.

4. Likewise, these amounts were treated and reported by the lessee as royalty expenses in its corporate income tax returns for its fiscal years ending June 30, 1959, 1960, and 1961. (Prentice and his associates had assigned the lease to Janes-Prentice, Inc., a Texas corporation).

5. Woods also claims refunds of alleged overpayment of 26 U.S.C. § 6654(a) penalties and interest for each of the years in question.

which must be classified as an "economic interest." Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. The Supreme Court has stated that an economic interest exists where a taxpayer has: "(1) 'acquired, by investment, any interest in * * * [the minerals] in place,' and (2) secured by legal relationship 'income derived from the extraction of * * * [the mineral], to which he must look for a return of his capital.'" Commissioner of Internal Revenue v. Southwest Explor. Co., 1956, 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347, 353.[6]

It should be noted that the controlling concept of "economic interest" was enunciated and refined by the Supreme Court in cases involving oil and gas leases. A study of hard mineral cases indicates that its application by other courts has been far from consistent outside of the field of oil and gas, although there would appear to be no apparent justification for a difference in approach depending upon the nature of the mineral involved.[7] In spite of this lack of uniformity of approach, an exhaustive examination of the cases in light of the policies of the

relevant portions of the internal revenue laws, leads us to the firm opinion that the proceeds here under consideration were properly taxed as ordinary income.

### I.

The "economic interest" test as developed by the Supreme Court clearly supports the classification of the funds involved here as ordinary income. In Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, the Supreme Court dealt with the precise issue now before this Court, although the contractual agreement there involved dealt with the extraction of oil and gas. The assertion of the taxpayer was the same —that the lease agreement was actually a sale of the minerals in place and that he was therefore entitled to capital gains treatment. This contention was rejected by the Court, which used the case as an opportunity to investigate the policies behind the then relatively new capital gains provisions of the Internal Revenue law. The Court recognized that the purpose behind capital gains treatment is to avoid the hardship of taxing as income in one year the entire gain

---

6. This definition of "economic interest" has been faithfully adopted by the Treasury Department. Treas.Reg. § 1.611-1 (b) (1) (1960). The "economic interest" test, of course, has wide application throughout the tax law. Use of that term in this opinion, however, specifically refers to its development and application as the standard by which the issue before this court is to be resolved—*i. e.*, when will proceeds arising out of agreements calling for the exploitation of mineral deposits be considered ordinary income and when will they be taxed as proceeds from the sale of a capital asset.

7. See e. g., Sneed, The Economic Interest—An Expanding Concept, 35 Texas L. Rev. 307 (1957); Zarly, The "Sale" or "Lease" of Solid Minerals, P.H. Oil & Gas Taxes ¶ 1012 (1960); Comment, Sale or Lease? Disparate Tax Treatment of Mineral Transactions by Courts Based on Nature of Mineral Involved, 42 Texas L.Rev. 707 (1964). The Treasury Department has expressed the view that the same rule shall apply no matter what the nature of the mineral involved. See Contingent Deferred Payments: A

Study in Contradiction, 10 Oil & Gas Tax Q. 117, 118 (1961).

Some hard mineral cases reject the applicability of the test as developed in the oil and gas area. See Barker v. Commissioner of Internal Revenue, 2nd Cir. 1957, 250 F.2d 195; Charles H. Remer, 28 T.C. 85, aff'd 8th Cir. 1958, 260 F. 2d 337. More prevalent, however, are cases in which a decision has been reached by acknowledging the relevancy of the economic interest test and considering factors such as: the intent of the parties; the language used in the instrument of transaction; the requirement, or likelihood, that all the mineral will be extracted; the presence of initial payments and/or their relative size as compared to payments based upon production; the absence of an affirmative duty to mine; and whether exploitation of the mineral was the primary purpose of the transaction to the landowner. Some of these factors have been considered in Supreme Court cases; others, however, have not and would appear immaterial to the proper application of the economic interest test.

due to appreciation of value of a capital asset over a considerable period of time.[8] It was noted, however, that "taxation of the receipts of the lessor as income does not ordinarily produce the kind of hardship aimed at by the capital gains provision of the taxing act."[9] The Court continued by pointing out that the capital gains provision "speaks of a 'sale,' and these leases would not generally be described as a 'sale' of the mineral content of the soil, using the term either in its technical sense or as it is commonly understood."[10]

It can thus be stated that *Harmel* stands for the proposition that an agreement in the nature of a mineral "lease" is not entitled to tax treatment as a sale of capital assets. Yet, *Harmel* did not set forth any criteria to facilitate a determination of whether a given agreement contains those characteristics which render that decision controlling. The needed standard was supplied by the economic interest test of Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. The issue in *Palmer*, dissimilar to that in *Harmel*, was whether a lessee under an oil and gas lease who subsequently conveyed certain of his lease interests to a third party was entitled to depletion on that consideration paid him by the third party. The Court held that he was entitled to depletion since he had retained by his stipulation

for royalties with the third party "an economic interest in the oil, [and gas] in place." The provisions of the agreement, the Court held, retained in the original lessee "an economic interest in the oil, in place, identical with that of a lessor." This interest was "depleted by production" and this reliance upon production for gain under the agreement was clearly the critical factor in the Court's reasoning.[11]

Subsequent Supreme Court cases have shown that the test for determination of whether proceeds are taxable as capital gains or ordinary income is the same as that for determining whether proceeds are subject to depletion.[12] The standard, first enunciated in Palmer v. Bender, has been clarified but not altered in any significant manner to this date.[13]

■ A detailed discussion of the subtleties and intricacies of the economic interest test is not necessary to its application in the present case. Clearly, where a "typical" mineral lease is entered into by a landowner, there is a retention of an economic interest in the minerals. In any case, therefore, an inquiry into the presence of such an interest need go no further unless it can be shown that some characteristics of the agreement make it atypical.

■■ The agreement here involved is on its face a typical mineral lease.[14]

---

8. Id. at 106, 53 S.Ct. at 75, 77 L.Ed. at 202:

> The provisions * * * for taxing capital gains at a lower rate * * * were adopted to relieve the taxpayer from these excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.

9. Ibid.

10. Id. at 107, 53 S.Ct. at 75, 77 L.Ed. at 203.

11. Id. at 557–558, 53 S.Ct. at 227, 77 L. Ed. at 493–494.

12. See Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 1946, 328 U.S. 25, 35, 66 S.Ct. 861, 867, 90 L.Ed. 1062, 1069. See also, Anderson v. Hel-

vering, 1940, 310 U.S. 404, 407–408, 60 S.Ct. 952, 954, 84 L.Ed. 1277, 1279–1280, and cases cited therein.

13. For a detailed discussion of the history and growth of the "economic interest" test, see *Sneed*, supra note 7. Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, supra note 12, reviews the first sixteen years of the test's history. See also footnote 7 in Parsons v. Smith, 1959, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747.

14. Of course, by the use of the term "typical" we do not mean that all, or most, mineral leases are substantially identical. They are not. However, certain characteristics of such agreements are typical in the sense of being quite common. That the present lease is typical may be shown by a comparison of its

Yet, the taxpayer bases his claim upon the presence of an allegedly uncommon provision which stipulates royalty payments of a fixed amount per cubic yard of mineral removed, rather than of a certain percentage of market value, sales price, or some similar quantity. Contrary to taxpayer's position, royalty payment measurement, as in the lease under consideration, is anything but uncommon in hard mineral cases. In fact, such a provision appears to be typical.[15] Granted, a royalty determined by quantity removed is foreign to the field of oil and gas leases, the area in which the economic interest test originated. As stated earlier, however, that test is not limited to the oil and gas area and its application to other areas is not to be controlled by the peculiarities of oil and gas leases. Under the economic interest test, the critical consideration is whether payment is dependent upon extraction, not the method by which that payment is calculated.[16] Thus, the difference in the typical measurement of

---

terms with lease characteristics discussed in 42 Texas Jurisprudence 2d, Oil and Gas §§ 169, 175–77, 184–91, 195, 197–201, 214, 242, 297. See also Douglas v. Commissioner of Internal Revenue, 1944, 322 U.S. 275, 64 S.Ct. 988, 88 L.Ed. 1271, wherein the Supreme Court dealt with a hard mineral lease substantially identical to the one here under consideration. Clearly, the lease in *Douglas* retained an economic interest in the lessor.

15. See e. g., Douglas v. Commissioner of Internal Revenue, supra note 14; United States v. Biwabik Mining Co., 1918, 247 U.S. 116, 38 S.Ct. 462, 62 L.Ed. 1017; Von Baumbach v. Sargent Land Co., 1917, 242 U.S. 503, 37 S.Ct. 210, 61 L.Ed. 460; Maude W. Olinger, 1956, 27 T.C. 93, 95; Treasury Reg. § 1.612–3(b) (4) (1960), example (1).

The leases in all of the above cases involving hard minerals called for royalty payments of a fixed amount per unit of minerals removed from the land. The *Sargent Land Co.* and *Biwabik Mining Co.* cases are particularly damaging to taxpayer's position. The leases in both cases were strikingly similar to that in the present case. Although the cases were decided before the birth of the economic interest test and were concerned with the application of earlier tax provisions, the issue dealt with in both cases was identical to that at bar—whether the agreements between the parties constituted a sale of the minerals in place. In both cases the Supreme Court held that there was no sale and that the proceeds received under the agreements were income in the same sense as rent. See also Lynch v. Alworth-Stephens Co., 1925, 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660.

16. The contention of taxpayer is based largely upon a misreading of the word "production" as used in the economic interest test. Taxpayer would attribute to the phrase "dependent upon production" a requirement of dependency upon the profitability of refinement of the product for commercial use, rather than merely upon removal of the mineral from the leased premises. It is in the latter sense that the Supreme Court has used the term "production," and it should be read as connoting nothing more than extraction for commercial use. This is nowhere expressly stated by the Supreme Court, but a close reading of the cases points to that conclusion. See Palmer v. Bender, supra; Douglas v. Commissioner of Internal Revenue, supra note 14. See also Bel v. United States, W.D.La. 1958, 160 F.Supp. 360.

The only Supreme Court case cited by taxpayer containing language possibly contrary to the above proposition is Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, 1965, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116. *Paragon* contains language concerning the effect of per unit compensation upon a determination of the presence of an economic interest. When that language is viewed in context, it is abundantly clear that it lends no support to taxpayer's assertion. *Paragon* involved the question of whether sublessee-contract miners were entitled to percentage depletion allowance upon income received from the lessee. The tax consequences as to the lessor-landowner were in no way involved. Furthermore, the determination of the issue in *Paragon* turned upon whether the contract miners had a capital investment in the mineral—the first factor of the economic interest test—rather than upon whether the miners looked solely to production for a return on their investment if indeed one existed. After studying all aspects of the contract miners' relation with the lessee, the Court concluded that the miners had no interest in the coal. It is clear from

payment under oil and gas and hard mineral leases should not affect the application of the economic interest test.

Taxpayer next argues that, even if the royalty payments are based upon production, the presence of minimum guaranteed royalty provisions in the agreement, requires a finding that his income was not based solely upon production as required by the economic interest test.[17] This contention is without merit as the courts have stated many times that a minimum royalty, such as that present in this case, is merely an advancement for future payments in the form of a guarantee and does not render payment dependent upon a factor other than extraction or production.[18]

■■ Taxpayer advances several other arguments in support of his contention that the agreement totally divested

him of all economic interest in the minerals under his land. As stated earlier, however, nothing in the agreement persuades us that it varies substantially in regard to the interests of the parties from those which the Supreme Court has held do not give rise to total divestment of economic interest by the landowner.[19]

## II.

We now pass to a consideration of the hard mineral cases decided by the courts of appeals. The two most recent decisions that deal with the issue at hand lend strong support to the government's position. Rabiner v. Bacon, 8th Cir. 1967, 373 F.2d 537, the Eighth Circuit dealt with a "Lease Contract" for the removal of sand and gravel. Aside from the fact that it stipulated no minimum royalty and was for a definite period of time, the lease was substantially identi-

a reading of the opinion that the Court viewed the contract miners as simply "sellers of services"—i. e., the service of mining the coal—and the fact that the compensation for those services was computed as a certain amount per unit mined did not vest in them an economic interest.

17. Kirby Petroleum Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 599, 604, 66 S.Ct. 409, 411, 90 L.Ed. 343, 348:
    Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil.

18. One need go no farther than Burnet v. Harmel, supra, to produce the answer to taxpayer's argument. See also Freund v. United States, 7th Cir. 1966, 367 F.2d 776; Laudenslager v. Commissioner of Internal Revenue, 3rd Cir. 1962, 305 F.2d 686, 691; Albritton v. Commissioner of Internal Revenue, 5th Cir. 1957, 248 F. 2d 49. The Treasury regulations also provide that advance minimum royalties are subject to depletion—i. e., that they do not mitigate against the presence of an economic interest. Treas.Reg. §§ 1.611–1 (b), 1.612–3(b) (1960).
    Nearly all provisions for minimum royalties are similar to that in the instant case in that the minimum payments are in the nature of an advance and are credited against actual royalties as then become due. Such minimum payments are not added compensation separate and

apart from the royalty payments. See lease paragraph (4), supra note 3.

19. Although we do not deem it necessary to develop at length the rationale behind the economic interest test, passing mention of two provisions of the contract at hand is called for by the arguments presented in taxpayer's brief. Paragraph (5) of the agreement [which provides for reduction of royalty payments when "national emergency or calamity" make it impossible for the lessee to "sell materials profitably or in quantities sufficient to meet the minimum royalty guarantee"] clearly demonstrates the dependence of the lessor's interest under the contract upon lessee's exploitation of the minerals. See also the wording of Paragraph (4), supra note 3.
    In attempting to demonstrate a lack of retained economic interest, taxpayer states that under the contract he cannot compel the lessee to mine any sand and gravel. This in all probability is an incorrect statement of the legal ramifications of the contract. The habendum clause, paragraph (4), is worded in a manner typical of oil and gas leases. The Texas courts have held that such a clause gives rise to an implied covenant to produce. See 42 Tex.Jur.2d, Oil & Gas, § 214 and cases cited therein. See also 2 Summers, Oil and Gas §§ 281, 306–307 (1959). Logically then, a Texas court would hold that such a covenant is to be read into the contract here under consideration.

cal to the one at bar. The payments to the lessor were to be measured by a fixed price per unit of mineral removed. The Court, placing primary reliance upon Burnet v. Harmel and Palmer v. Bender, held that the contract was a lease and not a sale of the minerals in place and that landowner's compensation under the lease was ordinary income. As in the present case, the taxpayer emphasized the presence of a fixed rate of compensation. The court rejected the contention that when so measured, royalty payments cannot be considered as a retained economic interest:

> The method of payment, however, is not dispositive of the question. Regardless of how payments are made, taxpayer's income here was derived solely from the extraction of the mineral and was geared to the production of the mineral. We think it can be safely said that taxpayer retained an economic interest in the subject minerals whether any were mined or not. He had an economic interest in the minerals mined by reason of income he received from the exploitation of his lands and the extraction of the minerals. In this way, he was compensated for the return of his capital by the depletion allowance rather than the capital assets gain provision which results from a sale of capital assets.

Id. at 539 (Emphasis added.) [20]

The Seventh Circuit has recently dealt with a factual situation even more closely in point. In Freund v. United States, 7th Cir. 1966, 367 F.2d 776, the taxpayer entered into a contract for the removal of sand and gravel from his land. As in Rabiner, the contract covered a definite period of time. There was, however, provision for a minimum annual payment and compensation was set at a fixed price per unit of mineral removed. Taxpayer argued that because of the minimum guaranteed payment and the fixed unit price, a sale was effected. The court, however, rejected this reasoning, holding that nothing in the case removed it from the general rule of Burnet v. Harmel. The court also noted that the agreement was, on its face, a typical mineral lease.

Another case, the logic and holding of which support the conclusion reached by us in the instant case is, Laudenslager v. Commissioner of Internal Revenue, 3rd Cir. 1962, 305 F.2d 686. In Laudenslager, the taxpayer owned land across which a highway was to be built. One of the contractors inquired of taxpayer about the purchase of earth fill for use on the highway. An agreement was reached whereby the contractor could take fill from certain portions of taxpayer's land. Compensation was set at $.05 per cubic yard, and the contractor agreed to take a minimum of 400,000 cubic yards (on the condition that it met highway specifications). The court held, in a well-reasoned opinion, that the payments made to the taxpayer pursuant to this agreement were taxable as ordinary income. This decision was grounded upon an application of the language

20. The opinion in Rabiner was handed down subsequent to the oral argument in the present case. Taxpayer, in argument to this Court, presented an earlier Eighth Circuit case, Commissioner of Internal Revenue v. Remer, 8th Cir., 1958, 260 F.2d 337, in support of his position. In Remer, the taxpayer purchased two stockpiled iron ore leases. By written agreement he "sold and assigned" the leases to an iron mining company. The compensation under the agreement was a $200,000 down payment to be paid over a three-year period, plus an additional $.10 as each ton of iron ore was shipped from the premises. The court held that the agreement constituted a sale and that taxpayer had not retained an economic interest in the iron ore. Great weight was given to the large down payment and to the wording of the agreement between the parties, and the court considered the down payment as the primary consideration, feeling that the act of removal of the stockpiled iron ore was considered by the parties merely as a convenient measurement of additional consideration.

The manner in which Remer is distinguished by the court in Rabiner clearly demonstrates its inapplicability to our present case.

of the Supreme Court in Burnet v. Harmel, discussed in the opening portion of our opinion.

Taxpayer cites Linehan v. Commissioner of Internal Revenue, 1st Cir. 1961, 297 F.2d 276, in support of the contention that his contract effected a sale of the minerals in place. In *Linehan* the taxpayer had a small tract of land which was zoned for industrial use only. Pursuant to his desire to develop the land, he entered into a contract with a gravel company whereby the company agreed to excavate all sand and gravel down to a specific grade. The minerals thus removed were to be paid for at a fixed rate per cubic yard and the approximate amount to be removed was determined by a quantity survey. When called upon to determine the tax consequences of this arrangement to the landowner, the court found that a sale of the minerals had been effected. Aside from questioning the reasoning used by the court to reach this conclusion,[21] we also deem *Linehan* clearly distinguishable from the present case on its facts. In *Linehan* the gravel company was obligated to remove all of the sand and gravel down to a specific grade. Furthermore, the primary purpose of the contract, in the taxpayer's mind, was to make the land suitable for industrial use by lowering the grade. It would also appear that the amount of sand and gravel contained in the areas "sold" was approximated in advance of the agreement by means of a survey. Surely these factors are much more compatible with a finding that a "sale" had occurred than are the facts of our case.[22] Consequently, we do not consider *Linehan* as persuasive authority for taxpayer's position.

In Barker v. Commissioner of Internal Revenue, 2nd Cir. 1957, 250 F.2d 195, the Second Circuit dealt with an agreement which was worded as a sale of the sand and gravel in place on taxpayer's land. The contract called for an initial consideration of $10,000, minimum quarterly payments of $3,000, and a fixed price per cubic yard of mineral removed. The court gave strong weight to the wording of the contract and held that it constituted a sale. Emphasis was placed upon the fact that title to the sand and gravel in place passed under the agreement,[23] and the court felt that the "concept of 'retained economic interest', developed in connection with depletion deductions in transactions relating to oil, gas and mineral extraction" was not applicable. This, we feel, for reasons stated earlier, is contrary to the view of the Supreme Court.

21. The court stated:

> [I]t is evident that the taxpayer had no "economic interest" in the material taken from his property after its severance, for in every instance he sold sand and gravel for fixed prices per cubic yard without reference to the prices received or the profits, if any, made by the exploiters.

297 F.2d at 279. In our minds, this reasoning should be questioned on two counts. First, the question is not whether the taxpayer retains an economic interest in the mineral once it has been removed, but rather whether, under the contract, the taxpayer retains an economic interest in the minerals in place. Secondly, as we have shown above, computation of compensation by a fixed price per unit volume removed does not alter application of the economic interest test. See footnote 16 and accompanying text. See also Samuel L. Green, 1961, 35 T.C. 1065.

22. This is not to imply that, presented with the factual situation before the court in Linehan, we would reach the same result.

23. The prevailing view, however, is that concepts of title are not material to the question of economic interest. See e. g., Kirby Petroleum Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Palmer v. Bender, 1933, 287 U.S. 551, 557, 53 S.Ct. 225, 227, 77 L.Ed. 489, 493; Weinert's Estate v. Commissioner of Internal Revenue, 5th Cir. 1961, 294 F.2d 750, 756 and cases cited therein. Illustrative of this principle is the fact that Texas courts have interpreted the typical oil and gas lease as passing a determinable fee title in the mineral estate. 42 Tex.Jur.2d, Oil & Gas § 177. Yet, such leases do not divest the landowner of all economic interest for purposes of the tax law.

Since such reliance is placed upon the wording of the contract as a sale, a factor not present in the case at bar, *Barker* is clearly distinguishable on its facts from our present case. Furthermore, the failure of the court to look to the economic realities of the transaction through application of the economic interest test removes the case from consideration by us as controlling precedent.

Gowans v. Commissioner of Internal Revenue, 9th Cir. 1957, 246 F.2d 448, is also relied upon by taxpayer. This reliance, however, is misplaced. *Gowans* involved an agreement worded in terms of a sale and obligating the "buyer" to remove all sand on taxpayer's land. By subsequent agreement, the payments for the sand removed were secured by a bank note. Viewing these facts, the court found that a sale had been effectuated. Strong emphasis was given to the fact that taxpayer's purpose in entering the contract was to prepare his land for subdivision development, not to exploit the sand deposits. The court further noted that under the agreement the buyer was obligated to remove all of the sand and that the quantity of the sand had been determined "with great accuracy" prior to execution of the agreement. The court also felt that the execution of a bank note as security for the buyer's performance gave the seller a source other than production from which to obtain his compensation under the contract. Viewing all of the above circumstances, the court held that taxpayer had not retained an "economic interest" in the sand. None of the factors which the Ninth Circuit viewed as removing the case from the general rule are present in the instant controversy. Clearly, therefore, what is said in *Gowans* does not weigh against our decision in this case.

United States v. White, 10th Cir. 1962, 311 F.2d 399, is also relied upon by taxpayer. The court in *White* had to determine the tax treatment to be given a large down payment received by the landowner under an instrument entitled "Mineral Deed." This instrument granted to the vendee thereunder all mineral interests except oil and gas. An initial payment of $175,000 was stipulated, along with future payments of 10% of gross value of all minerals removed. The court had before it only the question of the taxability of the initial $175,000 down payment (which was in no way tied to, or dependent upon, extraction of any mineral). Viewing the language of the instrument and the size of the initial payment, the court concluded that taxpayer could treat the $175,000 as capital gain. The instrument involved was thus substantially dissimilar from the lease agreement in the instant controversy. Furthermore, the court expressly stated that no implication concerning the taxability of possible future royalty payments under the mineral deed should be drawn from the opinion.

A discussion of applicable Fifth Circuit law must center around Crowell Land & Mineral Corporation v. Commissioner of Internal Revenue, 5th Cir. 1957, 242 F.2d 864, and Albritton v. Commissioner of Internal Revenue, 5th Cir. 1957, 248 F.2d 49. Taxpayer argues strenuously that *Crowell* is controlling, while the government points to the holding in *Albritton.*

The question before the court in *Crowell* was the same as now under consideration. The taxpayer had entered into an agreement for the removal of sand and gravel from its land. The agreement was denominated a "Contract of Sale" and the parties were referred to throughout as vendor and vendee. The contract called for minimum payments each year, together with future payments measured by a fixed price per unit of sand and gravel removed.

The discussion of the law in *Crowell* is not lengthy and no doubt much of the court's reasoning is not apparent from the opinion. It would appear, however, that strong emphasis was placed upon the wording of the instrument as a contract of sale. The court reasoned that the instrument unambiguously revealed

the true intent of the parties and that such intent was determinative of the issue before the court.[24]

The same issue was again before the court a few months later in *Albritton*. In that case, the taxpayer executed an agreement "completely embodying the language of a typical lease." [25] The lease was of indefinite duration and provided for minimum monthly royalties. Royalty payments were to be measured by a fixed percentage of the retail sales value of the sand and gravel removed. As in *Crowell*, the court did not discuss the applicable law in detail, but merely stated that it was clear, under the Supreme Court cases developing and applying the economic interest test, that such an interest had been retained by the taxpayer. In so concluding, the court rejected taxpayer's contention that *Crowell* controlled.

Viewing our present factual situation in the light of *Crowell* and *Albritton*, we consider the latter to be the more applicable precedent. The lease in *Albritton* differed from that now under consideration in only one relevant regard —the method of measuring the royalty payments. We have shown, however, that this factual distinction is not to be

viewed as compelling a different legal result.[26]

It should be noted that each court of appeals decision relied upon by taxpayer involved factors not present in the instant case. In each case, these factors, here missing, were critical to the court's decision to allow capital gains treatment. In Linehan v. Commissioner of Internal Revenue and Gowans v. Commissioner of Internal Revenue the courts were influenced by the fact that preparation of the land for another use, not extraction of the minerals, was the primary motive of the landowners' action in entering into the contracts covering the minerals. The courts in the same two cases were influenced by a requirement in the respective agreements that all of the minerals covered by the contracts be removed.[27] In United States v. White, the court felt that a large down payment in no way tied to extraction was indicative of a sale. In Barker v. Commissioner of Internal Revenue, Gowans v. Commissioner of Internal Revenue, United States v. White, and Crowell Land & Mineral Coop. v. Commissioner of Internal Revenue, the deciding courts were strongly influenced by the fact that the respective agreements were couched in terms of absolute conveyances or contracts of sale.[28]

24. 242 F.2d at 866:
   A bona fide sale was the intent of the parties and it was expressed in terms free from ambiguity throughout the instrument in the provisions and conditions it set out. Looking to the actual circumstances as well as the language of the contract of sale, there is no occasion or basis for resorting to legal niceties of interpretation to defeat the basic purpose and effect of the transaction.

25. 248 F.2d at 51.

26. If indeed the method of determining royalties was the sole basis for the refusal of the court in *Albritton* to follow *Crowell*, we conclude that such distinction is not supported by a reasonable reading of the Supreme Court decisions. We feel, however, that this difference in the method of royalty computation was *not* the distinguishing factor in the two decisions. As far as can be discerned from a reading of the opinions, the wording of the respective contracts was the

primary factor causing the different results. Clearly then, *Crowell* would have no application in the present case, while *Albritton* would clearly be in point. We must state, however, that if the two cases were decided differently solely because of the wording of the agreements, we do not view such distinction as properly determinative of tax consequences under the economic interest test. See e. g., Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 266–267, 78 S.Ct. 691, 695, 2 L.Ed.2d 743, 748–749; Hamme v. Commissioner of Internal Revenue, 4th Cir. 1953, 209 F.2d 29, 32. See also United States v. Witte, 5th Cir. 1962, 306 F.2d 81.

27. The Tax Court has also viewed a requirement that all sand and gravel be removed as indicative of a sale. Robert M. Dann, 1958, 30 T.C. 499.

28. Whether or not any or all of these factors should be material under the economic interest test we do not here decide. An awareness of their influence in prior

312

The decision of the district court in this case is clearly supported by the rationale of the applicable Supreme Court cases and is in accord with our view of the letter and spirit of the relevant tax provisions. Furthermore, as no case in this or any other circuit persuades us toward a different interpretation of the law, we accordingly affirm.

cases and their absence upon the facts of the present case, however, serve to illustrate the strength of the government's position.